**Jacqueline BOWERS, Plaintiff,**

v.

**BETHANY MEDICAL CENTER, Defendant.**

**Civil Action No. 95–2622–GTV.**

United States District Court,
D. Kansas.

March 21, 1997.

Dirk L. Hubbard, Overland Park, KS, for Plaintiff.

Thomas M. Sutherland, Lynaia M. Holsapple, Holbrook, Heaven & Fay, P.A., Kansas City, KS, for Defendant.

## MEMORANDUM AND ORDER

VAN BEBBER, Chief Judge.

Plaintiff brings this action asserting a claim of disability discrimination in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Kansas Act Against Discrimination ("KAAD"), K.S.A. 44–1001 *et seq.*,[1] and a claim of retaliation in violation of the ADA, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Kansas common law. The case is before the court on defendant's motion for summary judgment (Doc. 43) and plaintiff's motion for partial summary judgment (Doc. 47).[2] For the reasons set forth below, *defendant's motion is granted in part and denied in part. Plaintiff's motion is denied.*

### I. Factual Background

Plaintiff Jacqueline Bowers commenced employment with defendant Bethany Medical Center in December 1987 as a nurse assistant. In July 1991, Bowers took a medical leave of absence in order to undergo knee surgery. She filed a workers' compensation claim as a result of the surgery, but the claim was dismissed. In April 1992, she filed charges against defendant with the Kansas Human Rights Commission, alleging race and disability discrimination. The Commission dismissed these charges in October 1992 for lack of jurisdiction.

In December 1992, plaintiff filed charges against defendant with the Department of Labor's office of Federal Contract Compliance Programs ("OFCCP"), alleging race and

---

1. In her original complaint, plaintiff also alleged that she had been discriminated against on the basis of her age and race. Plaintiff expressly abandoned those claims in her response to defendant's motion. Accordingly, the court grants summary judgment to defendant on those claims.

2. Plaintiff's motion for partial summary judgment doubles as her response to defendant's motion for summary judgment.

disability discrimination. In March 1993, while these claims were pending, plaintiff returned to work as a part-time information clerk. Three months later, she resumed full-time employment as a laboratory support specialist. On June 30, 1993, defendant entered into a conciliation agreement with the OFCCP, fully resolving plaintiff's December 1992 claims.

On July 1, 1993, plaintiff sustained an on-the-job injury to her left knee necessitating surgery. Shortly thereafter, she filed a workers' compensation claim seeking benefits for a work-related disability. (The parties ultimately settled this claim in October 1994.) As a result of the July 1993 knee injury and subsequent surgery, plaintiff was unable to perform the walking, standing, and weight-bearing functions of either a nurse assistant or a laboratory support specialist.

In September 1994, after recovering from her knee surgery, plaintiff contacted defendant and indicated that she was prepared to return to work. Plaintiff met with Jennifer Tusher, defendant's employment manager, on November 14, 1994, to discuss her medical restrictions and the feasibility of resuming full-time employment. Tusher, after consultation with other members of defendant's management, identified two available jobs that would accommodate plaintiff's physical limitations—unit receptionist and cafeteria cashier.

Several days later, defendant sent plaintiff to the Menninger Clinic's Return to Work Center and requested that Menninger confirm that the cashier and unit receptionist jobs would accommodate plaintiff's disability. The Menninger Clinic's report, based on a personal interview and an evaluation of medical records, concluded that both positions were within plaintiff's physical limitations. The report noted, however, that plaintiff "may need some time on the job before her typing skills are back at the level she possessed during her [clerical] training activities in 1981."

On December 5, 1994, defendant offered plaintiff full-time employment as either a cashier or a unit receptionist. The letter communicating this offer set forth the parameters of the two jobs. With respect to the unit receptionist position, defendant imposed the following requirements:

(1) Successful completion of the Bethany Medical Center Computer course in the month of December, 1994.

(2) Successful completion of orientation and on the job training of the job duties and responsibilities of a Unit Receptionist under the preceptorship of a highly experienced Unit Receptionist. This orientation would be conducted in five (5), eight (8) or ten (10) hour regular work shifts.

(3) Continued, but more limited supervision by the preceptor for an additional two (2) weeks after the orientation and on the job training described in paragraph 2 above.

(4) Upon successful completion of the training set forth in paragraphs 1, 2, and 3, assignment as a Unit Receptionist with satisfactory performance and accomplishment of the job duties and responsibilities as found in BMC policy 50–088 for the remainder of the 90 day introductory period.

(Pl.'s Resp., Ex. 4). Plaintiff accepted the unit receptionist position.

Plaintiff alleges that several days after she returned to work, her supervisors began harassing and ridiculing her. She contends that Sherry Perrin, upon seeing her in the cafeteria, commented to colleagues, "What is that black bitch doing in here? I thought I got rid of her." (Pl's. Resp., Ex. 1 at 209). Plaintiff claims that Anne Hagan, who knew that plaintiff had filed a workers' compensation claim, contacted her at home and warned her to refrain from interfering in personnel matters. Plaintiff asserts that Hagan also yelled at her at work, embarrassing her in front of a group of nurses. Both Perrin and Hagan deny ever having made such statements.

The job of a unit receptionist primarily entails the entering of physicians' orders into a computer. Plaintiff's training for the position began on December 12, 1994. Defendant assigned another unit receptionist, Valerie Stewart, to work with plaintiff on a one-on-one basis and serve as her preceptor.

Stewart conducted the training in a class-room-like setting, fashioning mock doctors' orders and instructing plaintiff on the proper methods of translating and inputting the orders into the hospital's computer system.

Plaintiff's orientation continued for more than two weeks. This time frame met or exceeded that provided to unit receptionist trainees in the past. During this period, with the exception of one day on which her preceptor was ill, plaintiff received daily supervision and review of her training. At her deposition, plaintiff testified that she is unaware of any other employee having received such individualized instruction.

Because nearly sixty percent of a unit receptionist's time is spent on order entry, mastery of the hospital's computer system is an essential function of the job. To facilitate the learning of these computer skills, defendant requires that all unit receptionists attend an Order Communications Class as part of their training program. Successful completion of the class is necessary to obtain a computer security code, without which the hospital's computer system cannot be accessed.

Plaintiff attended the Order Communications Class on December 21–22, 1994 and completed the written examination the following day. She received a score of forty percent; eighty percent is required to pass. Plaintiff then took the computer examination and received a score of forty-nine percent, a failing grade. Upon learning that plaintiff had not passed these tests, vice-president of patient care services Sylvia Maher and nurse manager Anne Hagan met with plaintiff and told her that she would be given additional practice time and a second opportunity to take the computer exam.[3] Maher and Hagan also explained to plaintiff that a second failure on the computer exam would result in her termination.

On December 29, 1994, plaintiff practiced her skills with Patricia McAdams, a clinical information support specialist at the hospital. Plaintiff was then given the choice of undergoing additional practice time or retaking the computer exam immediately; plaintiff opted for the latter course. Her score, sixty-seven percent, was a failing grade. Although defendant has no written policy on the matter, it never has permitted an employee to take the computer examination more than twice. Defendant discharged plaintiff immediately upon her second failure of the hospital's computer exam.

## II. Summary Judgment Standards

In deciding a motion for summary judgment, the court must examine any evidence tending to show triable issues in the light most favorable to the nonmoving party. *Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir. 1984). A moving party is entitled to summary judgment only if the evidence indicates "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine factual issue is one that "can reasonably be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be discharged by "showing" that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. Thus, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.*

## III. Discussion

Plaintiff asserts claims of disability discrimination and retaliation. The court will consider each in turn.

---

3. Neither party discusses why plaintiff was not required to retake the written examination.

### A. Disability Discrimination

Plaintiff first argues that defendant discriminated against her by providing her inadequate training for a unit receptionist position and subsequently discharging her. The ADA mandates that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

■ Plaintiff offers no direct evidence showing that defendant discriminated against her on the basis of a disability, relying instead on circumstantial evidence to prove defendant's discriminatory intent. To "sharpen the inquiry into the elusive factual question of intentional discrimination" under the ADA, the Tenth Circuit has adopted the burden shifting scheme originally set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *White v. York Int'l Corp.*, 45 F.3d 357, 361 n. 6 (10th Cir.1995) (citation omitted). Under this framework, plaintiff must first establish a *prima facie* case by demonstrating that: (1) she is a "disabled" person within the meaning of the ADA; (2) she is "qualified," that is, with or without reasonable accommodation (which she must describe), she is able to perform the essential functions of the job; and (3) the employer discriminated against her because of her disability.[4] *White*, 45 F.3d at 360–61.

■ Both parties agree that plaintiff suffers from a disability. Defendant claims, however, that plaintiff was not "qualified" for the unit receptionist position. Defendant's argument neglects a crucial step in the *prima facie* analysis. The focus of plaintiff's "qualifications" is on her *original*—not her *reassigned* position. *See Guillot v. Garrett*, 970 F.2d 1320, 1327 (4th Cir.1992); 29 C.F.R. § 1630.2(m) (1996). The court, therefore, must determine whether plaintiff was qualified to perform the essential functions of the positions she occupied at the time she sustained her disability—nursing assistant and laboratory support specialist.

The Tenth Circuit utilizes a two-part test in assessing whether a disabled person is qualified within the meaning of the ADA:

> First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable [her] to perform those functions.

*White*, 45 F.3d at 361–62 (citation omitted). Plaintiff concedes that following her July 1993 injury and subsequent surgery, she was unable to perform the essential functions of either a nursing assistant or laboratory support specialist. She also makes no allegation that she could have performed the duties of those positions with an accommodation.

■ Some courts have held that an employer's obligation under the ADA ends upon a finding that an employee is not "qualified" for the position she held at the time she incurred her disability. *See, e.g., Guillot*, 970 F.2d at 1326–27. These courts focus on the general principle that "the duty of reasonable accommodation does not encompass a responsibility to provide a disabled employee with alternative employment when the employee is unable to meet the demands of [her] present position." *Myers v. Hose*, 50 F.3d 278, 284 (4th Cir.1995); *accord Dyer v. Jefferson County Sch. Dist. R–1*, 905 F.Supp. 864, 868–69 (D.Colo.1995).

The Tenth Circuit construes the term "qualified individual" somewhat broader, expressly incorporating in the phrase the concept of a "reasonable accommodation." *White*, 45 F.3d at 363. Because the EEOC guidelines provide that reassignment may be considered as a reasonable accommodation, *id.* at 362 (citing 29 C.F.R. § 1630.2(*o*)(2)(ii)), defendant had a duty to determine if plaintiff's physical impairment could be accommo-

---

4. Because both the ADA and KAAD define the term "disability" similarly, plaintiff's discrimination claims under the two statutes must meet the identical fate. *South v. NMC Homecare. Inc.*, 943 F.Supp. 1336, 1340 n. 2 (D.Kan.1996).

dated through a transfer to a different job. *Smith v. Midland Brake, Inc.*, 911 F.Supp. 1351, 1362 (D.Kan.1995).

■ Defendant satisfied its obligation by reassigning plaintiff to a unit receptionist position in December 1994, a transfer plaintiff concedes to have constituted a reasonable accommodation. Defendant ultimately discharged plaintiff, however, on the grounds that she was unable to master the computer skills that are an essential part of a unit receptionist's job. Plaintiff now contends that her failure to attain the requisite knowledge of the computer system resulted from defendant's inadequate training.

■ For plaintiff to state a *prima facie* case of disability discrimination, she must demonstrate a nexus between defendant's inadequate training and her disability. Plaintiff is unable to meet this burden. She first claims that defendant ignored the Menninger report stating that she needed additional time to hone her typing skills. There is no evidence, however, that plaintiff's inability to master the hospital's computer system was connected in any way to her typing skills. Moreover, "reasonable accommodation" does not require an employer to eliminate essential job functions. *Milton v. Scrivner. Inc.*, 53 F.3d 1118, 1124 (10th Cir.1995).

Plaintiff also contends that she should have been given a third opportunity to take the computer exam, something no employee had ever received.[5] Again, her inability to pass the test in two takes had no nexus to her disability. The ADA requires employers to accommodate disabilities—not general work deficiencies that have no connection to an employee's physical infirmity.

Plaintiff further argues that defendant discharged her prior to the completion of her ninety-day probationary training program. The court disagrees; defendant placed plaintiff in no such program. To the contrary, defendant's correspondence setting out the parameters of the unit receptionist position specifically stated that plaintiff would be given the opportunity to complete her ninety-day "introductory period" only "upon successful completion" of the orientation and computer training. After she failed the computer exam for the second time, plaintiff's introductory period ended.

■ Finally, plaintiff maintains that defendant's refusal to consider her for other jobs at the hospital after she failed the unit receptionist training entitles her to summary judgment on her ADA claim. There are two problems with this argument. First, as noted above, plaintiff's failure to satisfy the essential functions of the unit receptionist position was not connected to her disability. If a disabled individual is unable to meet the requirements of a job for reasons other than her disability, she is not a "qualified individual" within the meaning of the statute and is not entitled to an accommodation. *Dowden v. Tisch*, 729 F.Supp. 1137, 1138 (E.D.Tex. 1989), *aff'd*, 902 F.2d 957 (5th Cir.1990)(Table); *Wimbley v. Bolger*, 642 F.Supp. 481, 485 (W.D.Tenn.1986), *aff'd*, 831 F.2d 298 (6th Cir.1987) (Table). Second, plaintiff offers no evidence that any positions for which she was qualified were open at the time defendant discharged her. The ADA does not require an employer to reassign an employee to an occupied position or to create a new position for her. *White*, 45 F.3d at 362 (citing 29 C.F.R. pt. 1630, App. § 1630.2(*o*)).

Viewing all the evidence in a light most favorable to plaintiff, the court concludes that no genuine issues of material fact exist on plaintiff's ADA claim. Accordingly, summary judgment is granted to defendant on this claim.

### B. Retaliatory Discharge

■ Plaintiff's retaliation claim alleges that defendant discharged her in response to her filing various discrimination and workers' compensation claims. Plaintiff brings this charge pursuant to the anti-retaliation provisions of the ADA, 42 U.S.C. § 12203(a), and

5. In her deposition, plaintiff testified that defendant has given other employees nearly six weeks to complete their training. This allegation, however, is predicated on pure hearsay. Although plaintiff "need not produce evidence in a form that would be admissible at trial, ... the content or substance of the evidence must be admissible." *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir.1995) (citations omitted). Evidence premised on inadmissible hearsay "is not suitable grist for the summary judgment mill." *Id.*

**1392**

Title VII, 42 U.S.C. § 2000e–3(a), as well as the Kansas common law. Because the standards for these three theories are similar, federal district courts in Kansas apply burden-shifting approaches to each of the claims. *Ramirez v. IBP. Inc.*, 913 F.Supp. 1421, 1429 (D.Kan.1995).

 To state a *prima facie* case of retaliation, plaintiff must prove: (1) protected opposition to discrimination or participation in a proceeding arising out of discrimination; (2) adverse action by her employer, and (3) a causal connection between the protected activity and the adverse action. *Sauers v. Salt Lake County*, 1 F.3d 1122, 1128 (10th Cir.1993); *Mackey v. IBP, Inc.*, 167 F.R.D. 186, 194 (D.Kan.1996). Although the Kansas common law adds an element of knowledge as part of its proof scheme, *see Mackey*, 167 F.R.D. at 194, that requirement is implicit in the third element of the Title VII *prima facie* case. "A causal connection is established where the plaintiff presents evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Corneveaux v. Cuna Mut. Ins. Group*, 76 F.3d 1498, 1507 (10th Cir.1996).

 Defendant does not dispute that plaintiff's filing of discrimination and workers' compensation claims coupled with her December 1994 discharge satisfy the first two elements of her *Prima facie* case. Defendant insists, however, that the individuals charged with overseeing plaintiff's training did not know that she had filed any workers' compensation claims. This contention is unsupported by the evidence. Robert Fieger, defendant's personnel director, testified at his deposition that both Anne Hagan and Sharon Hayes were aware of plaintiff's claims at the time she returned to work in December 1994.

 Defendant next argues that the seventeen-month time lag between plaintiff's latest charge and her termination is too attenuated to demonstrate any causal connection. The court disagrees. As the Tenth Circuit recently held,

Protected conduct closely followed by adverse action may justify an inference of retaliatory motive. Although we have rejected attempts to unduly stretch the close

temporal proximity required under this standard, we also believe that the phrase "closely followed" must not be read too restrictively where the pattern of retaliatory conduct begins soon after the filing of the [claims] and only culminates later in actual discharge.

*Marx v. Schnuck Markets. Inc.*, 76 F.3d 324, 329 (10th Cir.)(internal citations omitted), *cert. denied*, —— U.S. ——, 116 S.Ct. 2552, 135 L.Ed.2d 1071 (1996). Although approximately one and one-half years had passed since plaintiff filed her latest workers' compensation claim and nearly two years had passed since plaintiff filed her latest discrimination claims, plaintiff had been absent from work during this entire period on disability leave. Defendant then discharged her within three weeks of her return to work. The court finds that this temporal proximity is sufficient to satisfy the third element of the *prima facie* case.

Once an individual satisfies her *prima facie* case, the burden of production shifts to the employer to articulate a facially nondiscriminatory reason for its employment decision. *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995). Defendant has met this burden by proffering the same explanation for plaintiff's discharge as it did in response to plaintiff's ADA claim—namely, plaintiff's failure to meet the essential functions of the unit receptionist position.

To avoid summary judgment at this stage, plaintiff must assert specific facts that suggest defendant's explanation is merely pretext for a retaliatory discharge. *Id.* Pretext may be established by showing either "that a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

 Plaintiff alleges that two days after she started her training for the unit receptionist position, her supervisors began harassing and ridiculing her. She contends that Perrin uttered racial epithets about her in front of colleagues and indicated an intent to "get rid of her." She claims that Hagan, who knew that plaintiff had filed workers'

compensation and discrimination claims in the past, called her at home and warned her not to get involved in personnel matters. She argues that Hagan also yelled at her at work and embarrassed her in front of a group of nurses. Both Perrin and Hagan deny that these events ever occurred. The incidents, however, construed in a light most favorable to plaintiff and coupled with the close proximity between plaintiff's return to work and her subsequent termination, raise genuine issues of material fact with respect to plaintiff's retaliatory discharge claim. Accordingly, summary judgment must be denied on this issue.

IT IS, THEREFORE, BY THE COURT ORDERED that defendant's motion for summary judgment (Doc. 43) is granted on plaintiff's ADA claim and denied on her retaliation claim.

IT IS FURTHER ORDERED that plaintiff's motion for partial summary judgment (Doc. 47) is denied.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**