# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 97-3567, 97-3620, 97-4071, 97-4197

_____

| | | |
|---|---|---|
| Winifred Browning, | * | |
| | * | |
| Appellee/Cross-Appellant, | * | |
| | * | |
| v. | * | Appeals from the United States |
| | * | District Court for the Eastern |
| Liberty Mutual Insurance Company, | * | District of Arkansas. |
| | * | |
| Appellant/Cross-Appellee. | * | |
| | * | |
| | * | |
| | * | |
| Equal Employment Opportunity | * | |
| Commission, | * | |
| | * | |
| Amicus Curiae. | * | |

_____

Submitted: December 16, 1998

Filed: June 2, 1999

_____

Before BEAM, FLOYD R. GIBSON, and LOKEN, Circuit Judges.

_____

BEAM, Circuit Judge.

Winifred Browning was a long-term employee of Liberty Mutual. She underwent surgery to treat cubital tunnel syndrome and returned to work part time. Her

employment was soon terminated and she commenced this action based on the Americans with Disabilities Act (ADA) and the Family Medical Leave Act (FMLA). After a trial, the jury found for Browning on the ADA claim. Liberty Mutual appeals. Browning cross-appeals the district court's denial of her motion for judgment as a matter of law on the FMLA claim. Because we find that Browning failed to establish that she was a qualified individual with a disability for purposes of the ADA, we affirm in part and reverse in part.

## I.    BACKGROUND

Browning began working at Liberty Mutual in 1985 as a data entry clerk. She performed well and was given several promotions and awards. She eventually attained the position of Claims Representative II. This position involved working with another representative as a two-person team to manage a certain class of claims. This entailed heavy phone contact, computer keyboard work, and manual note taking. When she received or placed a call relating to a claim, the computer needed to be searched to bring up information pertaining to that claim, client, or policy. Information taken from that call was then entered into the computer. If the amount of information was too great, or if she was otherwise unable to enter it all into the computer simultaneously, she would take handwritten notes and enter the information into the computer as soon after the call as possible. Accurate and up-to-date information in the computer is critical so that if someone else receives the next call regarding that claim, all current information is available.

The repetitive motion of her job injured the tendons in Browning's arm, and she developed cubital tunnel syndrome in her right arm.[1] Browning was placed on worker's

---

[1]Cubital tunnel syndrome is the result of damage to, or compression of, the ulnar nerve in the carpal tunnel at the elbow. See 5 Attorneys Medical Advisor, § 67:19 (Lee R. Russ, et al. eds.).

compensation leave, and Dr. Hixon performed a cubital tunnel release on April 26 1995. Dr. Hixon allowed Browning to return to work beginning May 30 for four hours per day for two weeks, then six hours per day for two weeks, and eventually to full-time work by the end of June. In addition, she was provided with a telephone headset and a dictaphone to record the information from her calls for later entry into the computer by someone else. Dr. Hixon provided a work release to Browning that limited her to no use of her right arm. However, the memo Dr. Hixon sent to Liberty Mutual stated "minimal use of right arm."

Upon her return to work on May 30, Browning was told that she would be working on property claims rather than injury claims, and that she would receive all her assignments from her supervisor, rather than work with her partner. She was assigned a markedly reduced number of claims and told that all her work would be reviewed on a daily basis. The next day when asked what she was doing, Browning commented that "I'm bored silly and I'm not doing anything." During the resulting conversation with Mr. Hedrick, the claims manager, he leaned over his desk and yelled at Browning "So what are you doing besides nothing? I didn't hire you for four hours a day for you to sit there and do nothing." In the same conversation, Hedrick realized the discrepancy between the release Dr. Hixon gave to Browning and the memo Dr. Hixon gave to Liberty Mutual concerning the restriction on the use of her right arm. Browning was told to stay home until the discrepancy could be resolved. She did not work the next day, June 1, while Liberty Mutual sought clarification from Dr. Hixon's office. On June 2, Browning reported to work and spent the day primarily filling out a multi-page survey. That was the last day Browning worked at Liberty Mutual.

Browning experienced pain and numbness in her arm over the weekend. On June 5, while she was being driven to work by her sister, Browning's arm became very painful and numb, such that she could not work. Browning became emotional and began to cry. Browning did not report for work, and this condition continued throughout the week. On Thursday, June 8, Browning had an appointment with Dr.

Hixon. Browning testified, "I told her I needed more time. I told her I couldn't do it like it was right now."

Liberty Mutual has a call-in policy whereby employees must call and speak to their supervisors if they are going to miss work. Since Browning did not have a phone in her home, she would call from her sister's house or have her sister call for her. On Monday, June 5, Browning's sister called her supervisor to explain that Browning's arm had gone numb, she had "broken down," and that she would not be in that day. On June 6 and 7, Browning attempted to call in, but was placed on hold, or was otherwise unable to contact her supervisor or her manager, Hedrick. When Browning failed to report on the 6, Hedrick spoke with Dr. Hixon's nurse to see if the doctor had withdrawn the work release. The nurse reported that Browning had called the doctor the day before, but the doctor did not change any of the restrictions. Browning's supervisor contacted Dr. Hixon again on June 8, after Browning's scheduled appointment. Dr. Hixon's office told her that Browning's restrictions had not changed, and that Browning had stated to them that she quit her job at Liberty Mutual.

Liberty Mutual issued a termination notice on June 9, citing job abandonment. At trial, Browning introduced evidence which indicated that the different treatment upon her return, and her termination, were due to her cubital tunnel injury and the resulting lack of productivity.

Browning tried unsuccessfully to look for work, then enrolled in college in August 1995. In January 1996, Dr. Hixon determined that Browning had reached her maximum level of recovery and assigned a ten percent loss of use to her right arm. In August 1996, a Functional Capacity Exam was performed on Browning which determined that her ability to lift was limited to ten pounds with her right hand and a twenty-pound limit over all. This limitation, as well as varying degrees of continued pain and sensitivity were determined to be permanent.

After trial, a jury found for Browning on her ADA claim and awarded her damages. The jury found for Liberty Mutual on the FMLA claim. Both sides moved for judgment as a matter of law, and both were denied. Liberty Mutual appeals the denial of its motion for judgment as a matter of law on the ADA claim, and Browning cross-appeals on the FMLA claim.

## II.    DISCUSSION

### A.    The ADA Claim

We review the denial of a motion for judgment as a matter of law de novo using the same standard as the district court. See Cox v. Dubuque Bank & Trust Co., 163 F.3d 492, 495-96 (8th Cir. 1998). We review questions of fact only to determine whether the verdict is supported by substantial evidence, and we view the evidence in the light most favorable to sustaining the verdict. See id. In order for a plaintiff to recover on an ADA claim, she must establish that, at the time of the adverse employment action: (1) she was a qualified individual; (2) she was disabled within the meaning of the ADA; and (3) she was terminated because of her disability. See, e.g., Wooten v. Farmland Foods, 58 F.3d 382, 385 (8th Cir. 1995).

Both parties spent great time and effort arguing over whether Browning's impairment was a disability under the ADA, and whether she was terminated because of her disability. We need not reach these issues because we find that Browning failed to establish that she was a qualified individual under the ADA at the time of her termination. Under the ADA, a qualified individual is an individual who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." 42 U.S.C. § 12111(8). The determination of whether an individual is qualified for purposes of the ADA is a two-step process, and should be made as of the time of the employment decision. See 29 C.F.R § 1630.2(m) App. The first inquiry is to determine if the individual possesses

the requisite skills, education, certification or experience necessary for the job. See id. This is easily established by the fact that Browning previously held the position and performed well. The second inquiry is to determine whether the individual can, despite her impairments, perform the essential functions of the job either with or without reasonable accommodation. See id. An ADA plaintiff may not rely on past performance alone to establish that she is a qualified individual when the record clearly reflects diminished or deteriorated abilities. See Mole v. Buckhorn Rubber Prods., Inc., 165 F.3d 1212, 1217 (8th Cir. 1999). The job for which Browning must be qualified at the time of her discharge is not the temporary part-time position which she tried and failed to return to, but rather the job she held prior to her surgery. See Bowers v. Bethany Med. Ctr., 959 F. Supp. 1385, 1390 (D. Kan. 1997). Thus Browning had the burden to prove that, with or without reasonable accommodation, she could perform the essential functions of her job as it existed before her surgery. However, the record reflects virtually nothing to indicate that, at the time Browning was fired, she could perform the essential functions of her job with or without accommodation.

Prior to her surgery, Browning's job entailed managing hundreds of claims. This involved nearly constant telephone and data entry keyboard activities, as well as manual note taking for entry into the computer immediately after the phone call. This was a full-time position. Indeed, Browning often worked through her breaks just to keep up with the work load. At the time of the alleged discriminatory termination, Browning's doctor had released her to work only four hours per day and with such restrictions that she could manage but a mere fraction of the claims she was responsible for prior to her surgery, and could do no data entry. Browning herself contends that, at the time, she was not sufficiently recovered to work even the reduced hours with the changes Liberty Mutual had made to accommodate her recovery. Browning testified about meeting with her doctor on June 8, "I told her I needed more time. I told her I couldn't do it like it was right now." This is supported by the fact that Browning was unable to report for work the entire week of June 5. Browning offers no evidence, and

does not even attempt to claim, that *at the time of her termination*, she could have performed the essential functions of her job with or without accommodation.[2]

Carol Bryant, Browning's former workmate testified for Browning that Browning's job could not have been performed using the dictaphone as an accommodation. Further, it is axiomatic that in order for Browning to show that she could perform the essential functions of her job, she must show that she is at least able to show up for work. See, e.g., Moore v. Payless Shoe Source, Inc., 139 F.3d 1210, 1213 (8th Cir. 1998). Browning testified that she was unable to report to work the entire week of June 5. Even if she could have reported to work, Browning was limited to only four hours per day and she made no showing that the essential functions of her full-time job could be performed in four hours. See Burnett v. Western Resources, Inc., 929 F. Supp. 1349, 1356-57 (D. Kan. 1996) (plaintiff restricted to four hours per day walking not qualified for full-time meter reader position).

The ADA is broad in its scope, but it only protects individuals who can perform their job. Browning was terminated while recovering from her injury, and *prior to* the point in her recovery when she could once again perform the essential functions of her job. The fact that she continued to heal, gain strength and use of her arm, once again becoming a qualified individual who could perform the essential functions of the job, does not obviate the fact that she was not a qualified individual at the time of her termination, and thus not under the protective umbrella of the ADA.

This result is dictated by the plain language of the statute, see 42 U.S.C. § 12111(8), and by logical policy considerations. Assuming that Browning is now a

---

[2]Browning did testify that she felt she could have performed the essential functions of her job at the end of June, when she was scheduled to be back to full- time, if she had accommodations–though she did not suggest what accommodations may have been needed.

qualified individual with a disability under the ADA due to her injury, there is no principled reason to accord her that status during her convalescence. Had her arm healed completely, such that she developed no disability, the ADA would provide no protection at all. See Heintzelman v. Runyon, 120 F.3d 143, 145 (8th Cir. 1997) (inability to work while recovering from surgery is not a disability under the ADA). See also 29 C.F.R. § 1630.2(j) App.[3] Employers are not qualified to predict the degree of success of an employee's recovery from an illness or injury. To afford Browning the protections of the ADA during the early stages of her recuperation from surgery, based on her eventual degree of future recovery, would be to burden Liberty Mutual with the duty to see into the future. We do not believe that such was the intent of Congress in passing the ADA.

While this holding may seem at first blush to render a harsh result, we point out that employees in Browning's situation may have protection from other sources under the circumstances. The employment contract, worker's compensation laws, or the FMLA may come into play to provide protection or recourse. The ADA, however, does not protect employees simply because an injury may result in a disability in the future. If, as Browning contends, Liberty Mutual fired her after years of service because of an injury that eventually resulted in a disability, rather than allow her to recover, it may be an injustice, but it is not prohibited by the ADA.

B.    The FMLA Claim

---

[3]This is not to say that a medical leave of absence cannot be a reasonable accommodation under the appropriate circumstances. See Hudson v. MCI Telecommunications Corp., 87 F.3d 1167, 1169 (10th Cir. 1996); 29 C.F.R. § 1630.2(o) App. However, the duty to accommodate does not arise unless the employee will be presently qualified if afforded the accommodation.

At trial, Browning claimed that she was denied leave under the FMLA. The Act provides for up to twelve weeks of unpaid leave to deal with a serious health condition. See 29 U.S.C. §§ 2601 *et seq*. Having carefully reviewed the record and the arguments submitted, we conclude the district court did not err in its denial of Browning's motion for judgment as a matter of law on her FMLA claim. Under the FMLA, the employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave. The employee need not specifically mention FMLA leave, but must state that leave is needed, and the statement should be made within one or two business days. See 29 C.F.R. § 825.303 Dr. Hixon released Browning to work under certain restrictions. And Browning, in fact, started working with those restrictions. On Monday, June 5, Browning's sister notified Liberty Mutual that Browning's arm had gone numb and that she would not be in that day. Two subsequent calls to Dr. Hixon later in the week confirmed to Liberty Mutual that the restrictions had not changed and that Browning was still released to work. A reasonable jury could easily conclude, based on the evidence presented, that Browning failed to give sufficient information to Liberty Mutual such that Liberty Mutual would be on notice that her situation qualified for FMLA leave. See Carter v. Ford Motor Co., 121 F.3d 1146, 1148 (8th Cir. 1997) (notice to the employer must be both adequate and timely); Satterfield v. Wal-Mart Stores, Inc., 135 F.3d 973, 980-81(5th Cir. 1998) (same), cert. denied, 119 S. Ct. 72 (1998).

## III.   CONCLUSION

Accordingly, we remand the case to the district court with instructions to grant Liberty Mutual's motion for judgment as a matter of law on the ADA claim. The denial of Browning's motion for judgment as a matter of law is affirmed.

A true copy.

Attest:


      CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.