79 F.Supp.2d 1096 (2000)
Patti S. KINNAMAN, Plaintiff,
v.
FORD MOTOR COMPANY, Defendant.
No. 4:98CV269SNL.
United States District Court, E.D. Missouri, Eastern Division.
January 10, 2000.
*1097 Mary Anne O. Sedey, President, Jon A. Ray, Sedey and Associates, William E. Moench, Associate, William E. Moench Law Offices, St. Louis, MO, for Patti S. Kinnaman, plaintiff.
W. Perry Brandt, Nicholas Lee DiVita, James R. Ward, Berkowitz and Feldmiller, Two Brush Creek Boulevard, Kansas City, MO, for Ford Motor Company, defendant.

MEMORANDUM
LIMBAUGH, Senior District Judge.
Plaintiff has filed this employment discrimination action alleging that defendant, on account of plaintiff's disability, failed to reinstate her and accommodate her physical restrictions in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et. seq. and the Missouri Human Rights Act (MHRA), § 213.010 et. seq. This matter is before the Court on the defendant's motion for summary judgment (# 50), filed November 18, 1999. This case is set for trial on the Court's jury trial docket of January 18, 2000.
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing court's trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita *1098 Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). Although summary judgment should seldom be granted in employment discrimination cases, it is proper in those cases wherein the plaintiff fails to establish a factual dispute on an essential element of the case. Snow v. Ridgeview Medical Center, 128 F.3d 1201, 1205 (8th Cir.1997), citing Bialas v. Greyhound Lines, Inc., 59 F.3d 759, 762 (8th Cir.1995).
The facts of this case are largely undisputed.[1]
Plaintiff began her employment with the defendant in 1978 and remained in the defendant's employ until May 15, 1996. Throughout her employment, plaintiff was classified as a full-time hourly "assembler". An "assembler" is an employee generally responsible for performing a variety of unskilled assembly line jobs. An "assembler" is given a job assignment normally on an intended permanent basis. There are three (3) job classifications for assemblers: Assembler-Body Shop; Assembler-Final Area; and Assembler-Paint. Most of the jobs assigned to the plaintiff were labor pool jobs in the production area referred to as the Final Area and required some degree of physical activity involving use of the wrists and hands, such as using power tools, and picking up materials. There are numerous different jobs on the line to which assemblers are assigned in the Final Area. As an assembler with seniority, plaintiff had the right to transfer upon request to either of the two other assembler classifications.
Plaintiff was a member of the Union[2] and worked under a Collective Bargaining Agreement. The CBA set forth the policies regarding attendance, and penalties for excessive and/or unexcused absences, up to and including termination. During the mid-1990s, a full-time assembler with plaintiff's seniority normally would work about 46 weeks each calendar year excluding vacation, company holidays, and plant-shutdowns[3].
Ford employees are eligible for several types of leaves of absence if they are unable to report to work or are otherwise absent under certain conditions. These include:
Personal Leave: If an employee is unable to report for work for three (3) days or more due to a health condition not related to his or her occupation, s/he is eligible to open a "personal leave" of absence, if supported by satisfactory medical documentation. Examples of "personal leave" might be absence due to the flu, injuries suffered outside the scope of employment, a scheduled medical treatment or operation. "Personal leave" is sometimes referred to by Ford employees and *1099 management as "personal medical leave" or simply as "medical leave".
Occupational Leave: If an employee is unable to report to work due to a health condition arising from his or her occupation, with the concurrence of the Plant physician, s/he is eligible to open an "occupational leave" of absence. "Occupational leave" is sometimes referred to by Ford employees and management as "occupational medical leave" or also simply as "medical leave".
Personal Absence: If an employee is absent from work for personal reasons not related to a health condition (or for a health condition of less than three days duration), his or her absence may be recorded as an unpaid "personal absence" leave. Examples of "personal absence" leave may be absence due to funerals outside the employee's immediate family, outside personal business, and family emergencies not covered by the Family Medical Leave Act (FMLA).
Personal No Work Available: If an employee is assigned physical work restrictions, but there is no work available within those restrictions, the employee may be placed on leave until such time work, if any, is available within the employee's physical restrictions or until such restrictions have expired.
During her employment, Kinnaman understood the procedure for "opening a medical leave" of absence[4], and that such a leave normally had a definite time-period; i.e. a date upon which the leave commenced and the date upon which the leave expired. Upon the date of expiration of the leave, the employee was expected to report to the Plant the next scheduled work day.
During an approved "medical leave" of absence (personal or occupational), an employee was eligible to collect up to 80% of his or her regular wages while off the job.
Beginning in 1990, plaintiff began experiencing pain and throbbing in her wrists. She also began experiencing the first of several reoccurrences of ganglia on both wrists, limiting the motion in the wrists and causing severe pain. In 1990 and 1991 plaintiff had surgery on her left wrist for ganglia, and suffered a broken left wrist in 1994. She had additional surgery on the left wrist in 1997. She takes anti-inflammatory drugs, ices her wrists, wears wrist splints, and has the ganglia drained when possible.
In 1994, the defendant's company doctor, Dr. Robert Thomas, imposed a permanent restriction on the use of her right wrist: limited grasp, squeeze and carry. However, she continued to work as an assembler in the Final Area, albeit on a very limited basis. In 1993, plaintiff worked at the Ford plant approximately a total of 106 days, about 99 days in 1994, about 31 days in 1995; and only about 7 days in 1996 prior to her termination. Thus, from 1993-May 1996, plaintiff missed an aggregate of approximately 117 weeks of work while on leave of absence, or nearly 75% of the approximately 156 weeks she normally would have been scheduled to work during this period.
From 1989 through 1996, plaintiff was granted 43 medical leaves of absence, most of them for personal reasons. In some cases, Kinnaman took as many as three (3) successive medical leaves of absence, with only a few days in between each leave. Many of her medical leaves were not related to the ganglia problem with her wrists. Such leaves included, among others, absence for flu and pneumonia, pinched neck nerve, multiple back problems, fractured ribs, depression, cuts and contusions due to assault by a boyfriend, bronchitis, scoliosis, urinary tract infection, shoulder injury from a fall from a horse, wrist sprain from falling out of bed, and a wrist cut from barbed wire.[5] Plaintiff had an alcoholism *1100 problem from 1980 through 1995 which contributed to some of her absences. In some cases, plaintiff obtained leaves of absence because she simply did not feel like going into work.
During plaintiff's various approved medical leaves of absence, she regularly received her pay benefits, including 80% of her pay.
Under the attendance and medical leave policies at defendant's plant, "Five-Day Quit" letters are issued when an employee fails to report for work following the expiration of a medical leave as scheduled, or because the employee fails to submit the proper paperwork for the absence. A "Five-Day Quit Letter" notifies the employee that s/he has not reported to work as scheduled following the expiration of an approved leave of absence, and that the employee has five (5) days in which to provide a satisfactory excuse for the unapproved portion of the absence; otherwise, the employee is subject to certain disciplinary action. Over a 20-month period from August 1994 through mid-April 1996 plaintiff was issued nearly seventeen (17) Five-Day Quit letters.
On or about April 18, 1996 plaintiff opened a personal medical leave for "thoracic neuralgia", scheduled to expire on April 24, 1996 with a return-to-work date of April 25, 1996. Prior to this leave period, plaintiff had been absent from work for various medical reasons from January 1, 1996; working only the week of March 4, 1996. Plaintiff did not return to work on April 25, 1996. She did not attempt to report to work until May 24, 1996. From April 25, 1996 through May 24, 1996 plaintiff was not hospitalized or otherwise incapacitated. Meanwhile, on May 15, 1996 defendant formally terminated plaintiff's employment.
Plaintiff grieved her discharge and ultimately her grievance was settled. Under the terms of the settlement, plaintiff was to be reinstated without loss of seniority and without backpay "contingent upon successfully passing a physical and drug screen". On December 11, 1996 plaintiff reported to the defendant's plant, was given a physical, and passed the drug screen. However, Dr. Thomas imposed two permanent restrictions: "limited grasp, squeeze and carry" for the left and right hands. On December 13, 1996 defendant determined that based upon these restrictions, plaintiff would not be reinstated. She remains unreinstated.
Defendant Ford contends that it is entitled to summary judgment because plaintiff cannot establish her prima facie case under the ADA and MHRA for the reason that plaintiff was not qualified to perform the essential functions of her job, with or without reasonable accommodation. Specifically, defendant contends that plaintiff's chronic, excessive absenteeism precludes her from being a "qualified individual" capable of performing the essential functions of her job, with or without reasonable accommodation. Plaintiff counters that defendant is precluded from raising the issue of plaintiff's chronic, excessive absenteeism because defendant settled plaintiff's grievance and agreed to reinstate her with full knowledge of her attendance record, defendant did not make regular attendance a condition of reinstatement, and that defendant's reason for denying plaintiff reinstatement was due to her physical restrictions, not her attendance record.
The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of the individual." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that [he or she] holds or desires." 42 U.S.C. § 12111(8). Similarly, the MHRA creates a cause of action against employers who discriminate *1101 against an otherwise qualified person on account of a disability. § 213.010 et. seq. R.S.Mo.
Claims of discrimination under the ADA are analyzed under the burden-shifting framework set forth in McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Greer v. Emerson Electric Co., 185 F.3d 917, 921 (8th Cir.1999); Stanback v. Best Diversified Products, Inc., 180 F.3d 903, 908 (8th Cir.1999); Buckles v. First Data Resources, 176 F.3d 1098, 1100 (8th Cir.1999); Bailey v. Amsted Industries, Inc., 172 F.3d 1041, 1044 (8th Cir.1999). The same analysis applies to a disability discrimination claim brought under the MHRA. Mole v. Buckhorn Rubber Products, Inc., 165 F.3d 1212, 1216 (8th Cir.1999); Nesser v. Trans World Airlines, 160 F.3d 442, 445 (8th Cir.1998); see also, Bizelli v. Parker Amchem, 17 F.Supp.2d. 949, 953 (E.D.Mo. 1998) citing Mathews v. Trilogy Communications, Inc., 143 F.3d 1160, 1164, n. 5 (8th Cir.1998).
Under McDonnell Douglas, a plaintiff must first establish a prima facie case by demonstrating that 1) s/he is disabled within the meaning of the ADA, 2) s/he is qualified to perform the essential functions of the job in question with or without reasonable accommodation, and 3) s/he suffered an adverse employment action because of the disability[6]. Greer, at 921; Buckles, at 1100; Webb v. Mercy Hospital, 102 F.3d 958, 959-60 (8th Cir. 1996); see also, Browning v. Liberty Mutual Ins. Co., 178 F.3d 1043, 1047 (8th Cir.1999). If the plaintiff establishes a prima facie case, the burden shifts to the defendant employer to come forth with a legitimate, nondiscriminatory reason for the employment action. Stanback, 908; Nesser, at 445. If the employer meets this burden, the plaintiff must then show that the employer's stated reason is a pretext for discrimination, and the real reason for the employment action was discrimination based upon plaintiff's disability. Stanback, at 908; Nesser, at 445.
Summary judgment is proper if the plaintiff fails to establish any one of the elements of his or her prima facie case. Nesser, at 445 citing Weber v. American Express Co., 994 F.2d 513, 515-16 (8th Cir.1993). For purposes of resolving the instant matter only, the Court will assume that the plaintiff is a "disabled" individual within the meaning of the ADA, and that her disability is "tenosynovitis in both wrists".[7] Even assuming that Kinnaman is a disabled individual within the meaning of the ADA, the Court agrees with the defendant that she is not a "qualified individual with a disability" because of her excessive absences.
The determination of whether an individual is qualified for purposes of the ADA is a two-step process, and should be considered as of the time of the adverse employment decision. The first inquiry is to determine if the individual possesses the requisite skill, experience, education and other job-related requirements for the position held or desired. Browning, at 1047-48; 29 C.F.R. § 1630.2(m). The second inquiry is to determine whether the individual can, despite his or her impairments, perform the essential functions of the job either with or without reasonable accommodation. Browning, at 1047-48; 29 C.F.R. § 1630.2(m).
Again, since the parties appear not to dispute plaintiff's possession of the requisite skill, education, and experience for the job as an assembler, the Court will assume that plaintiff has satisfied the first part of the test as to whether she is "qualified". *1102 However, as to the second part, plaintiff has the burden to prove that, with or without reasonable accommodation, she can perform the essential functions of the job as an assembler. This, plaintiff cannot do.
Plaintiff spends a considerable amount of her time arguing that the issue of her absenteeism is not material because it was never raised as the reason for defendant's refusal to reinstate her; nor was regular attendance ever made a condition of reinstatement. Plaintiff totally misses the point raised in the summary judgment motion. The issue of plaintiff's chronic, excessive absenteeism is highly relevant to plaintiff's prima facie case which must first be addressed before any consideration can be given to the merits of the defendant's reason for refusing to reinstate plaintiff. Whether plaintiff's claim is one for wrongful termination or failure to reinstate is immaterial because plaintiff must first make the threshold showing that she is a "qualified individual with a disability who can perform the essential functions of her job, with or without reasonable accommodation." Essentially, plaintiff is arguing that defendant's reason for refusing to reinstate her is pretextual, an issue that can't be addressed until plaintiff first establishes her prima facie case.[8]
"The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term `essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). A job function may be considered essential for different reasons and evidence of whether a particular function is essential includes, but is not limited to: the employer's judgment as to what functions of the job are essential; written job descriptions; amount of time spent on the job performing the particular function(s); and the consequences of not requiring the employee to perform the function. 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3).
Ford contends that regular and predicable attendance is an "essential function" of the assembler position, and that Kinnaman is not qualified because of her chronic, excessive absences. Kinnaman argues that regular attendance is not an "essential function" of the job because defendant has over 1400 assemblers, has established the position of "utility worker" (employee trained to perform a variety of jobs) to cover absences, and the Code of Federal Regulations does not include regular attendance as a job function considered to be essential. Furthermore, plaintiff contends that the existence of the plaintiff's "liberal" leave policy suggests that defendant does not consider regular and predictable attendance to be essential because it anticipates absences.
The Eighth Circuit Court of Appeals has expressly found that "regular and reliable attendance is a necessary element of most jobs." Greer, at 921-22; Buckles, at 1100-01; Nesser, at 445. Ford considers regular attendance to be an "essential function" as illustrated by its detailed attendance policies and procedures which were created with the input and acceptance by plaintiff's Union. The existence of these policies and procedures, regardless of their "liberal" nature is acceptable evidence of Ford's judgment that regular and predictable attendance is an essential function of the assembler position (as well as any other job at the Plant). Greer, at 922; Buckles, at 1101; Nesser, at 445-46. The fact that plaintiff was given several "Five-Day Quit Letters" for failing to abide by the attendance policies demonstrates that Ford did not take abuse of the attendance policies lightly. The fact that there are numerous employees classified as "assemblers" and Ford provides for absences by *1103 having a certain number of "utility workers" does not diminish the importance that Ford places on regular and predictable attendance. Buckles, at 1101. The Court defers to Ford's identification of regular and predictable attendance as an "essential function" of the assembler job. Nesser, at 445-46; 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3)(i).[9]
The undisputed record shows that plaintiff, prior to her termination in May 1996, progressively increased her absences to the point where she was gone virtually the entire time she was scheduled to work. A review of plaintiff's attendance records for 1993 through May 1996 indicates that, exclusive of vacations, company holidays, and Plant shut-down(s), Kinnaman worked only 106 days in 1993, 99 days in 1994, 31 days in 1995, and 7 days in 1996. Kinnaman does not dispute the accuracy of these records. Furthermore, many of her absences were not related to her alleged disability.
Plaintiff has failed to establish that she could perform any functions of the assembler position without accommodation because she is unable to perform the essential function of the job, namely attending work on a regular basis. There is no question that her absenteeism is chronic and excessive and clearly indicates that Kinnaman is unable to meet the essential functions of her job without accommodation. See, Greer, supra. (plaintiff not a "qualified individual with a disability" under the ADA based upon absences of 67 days of work in 1993, 65 days in 1994, and 110 days through September 15, 1995); Nesser, supra. (plaintiff not a "qualified individual with a disability" under the ADA based upon absences of 6 days of work in 1993, 43-44 days in 1994, and 175 days in 1995).
Kinnaman has the burden of showing that she could perform the essential functions of the assembler job with a reasonable accommodation. Buckles, at 1101; Nesser, at 446. Plaintiff failed to identify, much less provide evidence in support, of any reasonable accommodation which would enable her to regularly attend work. She fails to show how any accommodation, even placing her in another type of assembler position, would enable her to perform an essential function of the job, which is to show up for work on a regular and predictable basis. Plaintiff fails to provide any evidence that any reasonable accommodation was available which would provide her with the ability to show up for work as scheduled.[10] Furthermore, an employer is not obligated, under the ADA, to "put up with employees who do not come to work... [n]or must every company hire replacements for absent employees and call that a reasonable accommodation." Waggoner v. Olin Corp., 169 F.3d 481, 484 (7th Cir.1999). The ADA does not require an employer to provide a disabled employee *1104 with a job but not require that employee to regularly perform it. Waggoner, at 484. Finally, defendant is not required, under the ADA, to provide indefinite leaves of absences. Corder v. Lucent Technologies, 162 F.3d 924, 928 (7th Cir. 1998); Nowak v. St. Rita High School, 142 F.3d 999, 1004 (7th Cir.1998). An "indefinite leave of absence" is not "reasonable" because it does not enable a disabled person to work and the cost to any employer to pay both the absent worker and replacement worker to fill the same position for an indefinite period of time constitutes an undue burden on the employer. Thus, an indefinite leave of absence is not an "accommodation". Vande Zande v. State of Wisconsin Dept. of Admin., 44 F.3d 538, 542 (7th Cir.1995). Plaintiff appears to simply want to miss work whenever she believed she needed to and for as long as she desired. The ADA does not require Ford to wait until Ms. Kinnaman decided to show up for work and then guess how long she would remain on the job. Plaintiff offers no reasonable accommodation for such a situation, and under the circumstances of this case, the Court cannot reasonably fashion one.
Plaintiff has failed to demonstrate that she could perform an essential function of the job, namely regular and predictable attendance, with or without an accommodation. She has failed to show any genuine dispute of a material fact over her ability to show up regularly for work. The undisputed evidence shows that Kinnaman failed to meet her burden of establishing that she was "a qualified individual with a disability" either at the time of her initial termination, or at the time defendant refused to reinstate her. Since plaintiff cannot perform an essential function of the job, she is not a qualified individual under the ADA. Thus, plaintiff has failed to establish her prima facie case of disability discrimination. Judgment will be entered for the defendant as a matter of law.
NOTES
[1] Although plaintiff does not consider any of the facts set forth by the defendant in its Statement of Uncontroverted Facts as "material", she only specifically disputes three (3) listed facts regarding the importance of regular and reliable attendance at the Plant: Statement of Facts, Nos. 9, 10, and 11. Consequently, the majority of facts set forth by the defendant are deemed admitted.
[2] While employed at Ford, plaintiff was a member of the International Union of Auto Workers of America UAW, Local 325, and the International Union, United Automobile, Aerospace and Agricultural Workers of America.
[3] Evidently, there was a regularly scheduled Plant shutdown for two (2) weeks in July.
[4] In general, the "opening" of any type of leave consisted of notifying the requisite department (normally defendant's Labor Relations Department) and providing the required documentation for the specific type of leave required.
[5] Defendant's Exhibits/Tabs 5, 6, and 12 provide specific information as to the reasons given by plaintiff for opening medical leaves of absence, and her attendance record from 1989-1996.
[6] In some ADA cases involving wrongful termination, the last element of the prima facie case is often stated as "terminated under circumstances that raise an inference of unlawful discrimination". See, Stanback, at 908; Bailey, at 1044; Mole v. Buckhorn Rubber Products, Inc., 165 F.3d 1212, 1216 (8th Cir. 1999). The difference in stating the third element of the prima facie case under an ADA claim is not material to the resolution of the instant motion.
[7] Plaintiff's Complaint, Paragraph 4.
[8] Plaintiff also argues that defendant is "estopped" from raising the issue of plaintiff's attendance record because defendant never raised this issue with the plaintiff before; therefore, defendant has "admitted" that plaintiff is a qualified individual under the ADA. Plaintiff cites no caselaw in support of this "estoppel" theory and the Court finds such a theory meritless.
[9] Plaintiff makes the vague argument that Nesser, supra. is not controlling because the appellate court stated that attendance was a necessary element of most jobs, not all jobs. However, plaintiff fails to note how her job would not fall within the parameters of Nesser. Furthermore, as pointed out repeatedly by the Eighth Circuit, it is nonsense to consider regular attendance as anything other than "essential" since a plaintiff must be present at his or her job in order to do the job. Browning, at 1048 ("Further, it is axiomatic that in order for Browning to show that she could perform the essential functions of her job, she must show that she is at least able to show up for work."); Moore v. Payless Shoe Source, Inc., 139 F.3d 1210, 1212 (8th Cir.1998) citing Halperin v. Abacus Tech. Corp., 128 F.3d 191, 198 (4th Cir.1997)("An employee who is `unable to come to work on a regular basis [is]unable to satisfy any of the functions of the job in question, much less the essential ones'".); see also, Waggoner v. Olin Corp., 169 F.3d 481, 483 (7th Cir.1999)("It should not require saying that generally attendance is a requirement of a job.", citing Nesser, supra.).
[10] In fact, the evidence is quite clear that plaintiff's alleged disability (tenosynovitis of the wrists) was not the prevailing cause of her absences. Consequently, providing plaintiff with a position which would "accommodate" her physical problem would still not address her inability to perform an essential function of the job; i.e. showing up for work to do the job.