Joseph P. AMRO, Plaintiff,

v.

The BOEING COMPANY, Defendant.

No. Civ.A. 98–2257–KHV.

United States District Court,
D. Kansas.

July 23, 1999.

Bobbie R. Bailey, Kansas City, MO, for plaintiff.

J. Steven Massoni, Mikel L. Stout, Gaye B. Tibbets, Willaim M. Anderson, Foulston & Siefkin, L.L.P., Wichita, KS, for defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Joseph P. Amro, a senior engineer currently employed by The Boeing Company, brings suit for race, color and national origin discrimination and retaliation in violation of 42 U.S.C. § 2000e (Title VII) and 42 U.S.C. § 1981, and disability discrimination in violation of the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101. This matter comes before the Court on *Defendant's Motion For Summary Judgment* (Doc. # 66) filed May 13, 1999. For the reasons set forth below, the Court finds that defendant's motion should be sustained.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

In ruling on summary judgment, the Court will disregard conclusory statements and statements not based on personal knowledge. *Cole v. Ruidoso Mun. Schs.,* 43 F.3d 1373, 1382 (10th Cir.1994) (regarding conclusory statements); *Gross v. Burggraf*

*Constr. Co.,* 53 F.3d 1531, 1541 (10th Cir. 1995) (requiring personal knowledge).

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

### *Facts*

The facts set forth below are viewed in the light most favorable to plaintiff.

Plaintiff Joseph P. Amro, a male of Lebanese national origin and middle-eastern ancestry, is a naturalized United States citizen. Since December 1984, he has worked at Boeing. Although he completed an information card which stated that his race is White, Boeing has classified plaintiff as an Hispanic and an Asian or Southeast Asian.[1]

In a prior lawsuit, this Court granted Boeing's motion for summary judgment because plaintiff failed to produce evidence that in or before March 1996, Boeing discriminated against him on the basis of national origin or disability with regard to compensation and job assignments. *See Amro v. Boeing Co.,* 951 F.Supp. 1533, 1540–43, 1550–52 (D.Kan.1997), *aff'd,* 1998 WL 380510, 153 F.3d 726 (10th Cir.1998) (table) [*Amro I* ]. Plaintiff filed this lawsuit on June 10, 1998, alleging employment dis-

---

1. On its employment forms, Boeing classifies employees into various racial groups: "White (European, Middle East, North African & Others not classified below)"; Black; American Indian; "Asian & Pacific Islanders (Far East, Indian, Sub–Continent, Pacific Islands, Southeast Asia)"; and "Hispanic (Cuban, Latin American, Mexican, Puerto Rican, and other Spanish Origin)." Plaintiff filled out the

form indicating that his race is White. Sometime before 1987, Boeing changed plaintiff's records to indicate a racial classification of "Hispanic (Cuban, Latin American, Mexican, Puerto Rican, and other Spanish Origin)." By August 25, 1998, Boeing had changed plaintiff's classification to "Asian & Pacific Islanders (Far East, Indian, Sub–Continent, Pacific Islands, Southeast Asia)."

crimination based on events occurring after March, 1996.

From November 1994 until November 1997, Boeing classified plaintiff as a Senior Engineer in the Liaison Engineering department. Randy Henley was plaintiff's direct supervisor and Kevin Smith was his "lead." Frank Vopat, as People Support Manager, was responsible for supporting the product definition organization in the Wichita Boeing commercial division. Bob Ream was plaintiff's personnel representative.

### Facts Relevant To Plaintiff's Transfer Claim

In the employee comment section of his 1996 Performance Management document, plaintiff wrote that "I have met my key personal goals for support both the AOG and packages release on time. In addition my career growth toward salary and position commensurate with my education and my thirteen years of experience at Boeing have not [sic] met yet." Att. 2, Depo.Ex. 65, Amro 5435.

On March 19, 1997, Boeing notified plaintiff that his ranking on Boeing's "B-Totem" was 313 out of 383, placing him in the bottom 20 percent of DS-4 skill code engineers.[2] For 1997, Boeing gave plaintiff a merit increase of $1,700. Plaintiff told Henley that he was unhappy with his retention rating and raise.[3]

On April 4, 1997, plaintiff met with Henley and his second level manager, Jerry Kreutzer. Plaintiff expressed his view that based on actual performance, he was ranked far below where he should have been ranked. He also complained that he was not being paid the same amount as similarly situated DS-4 engineers who had comparable skills, experience, training and performance. Plaintiff told Henley and Kreutzer that he felt that he was being singled out and ranked unfairly because he had filed charges of discrimination and retaliation against Boeing. Kreutzer told plaintiff that his rankings were low because he was in an "entry-level drafting position" (Amro Aff., pp. 10–11), that his medical restrictions were hampering his career at Boeing, and that Boeing would not transfer him from a Grade 12 to Grade 14 because of his medical restrictions.[4] Kreutzer compared plaintiff's medical restrictions to a "ball and chain" on plaintiff's leg and told him that until his restrictions were removed, nothing (including merit increases, retention ratings and his B-totem ranking) would change.[5] In response, plaintiff agreed to tell Henley and Kreutzer if he found a position to which he wanted to transfer.

Plaintiff testified that at one point during the meeting, Henley took a paper that contained the medical restrictions, slammed it on the table and told plaintiff:

> God damn it. That is your problem because you have so many [medical] restriction[s] at Boeing. If you remove

---

2. DS-4 is the Boeing skill code for structural design engineers.

3. Plaintiff's 1997 raise is discussed more fully in the fact section addressing that year.

4. Neither party provides a full explanation in their briefs of the significance of the Grade designation or how it is determined.

5. Kreutzer also told plaintiff that as long as he had restrictions on use of CATIA (a graphical interface computer tool), he would not be considered for transfer to another engineering group. At the time, plaintiff had medical restrictions which prevented him from using a personal computer screen for more than 50 percent of his shift. Plaintiff claims that this restriction did not prevent him from using CATIA, which has a large screen and zoom capability. The medical restriction in the record, however, made no distinction among size of screens, but simply indicates that plaintiff was restricted from using any computer screen for more than 50 percent of a shift. In any case, plaintiff testified he was using CATIA for more than 50 percent of his work in Henley's group and in response to the comments from Henley and Kreutzer, plaintiff asked his doctor to change the restrictions so that they did not prevent him from using graphical computer systems, so long as he used a 17-inch (or larger) computer screen with zoom capability. On June 11, 1997, plaintiff's doctor clarified the restrictions to explicitly state that plaintiff could use CATIA.

your restriction[s] your retention will be changed, you B-totem will be changed and your salary will be changed. So, you tied up your restriction[s].

(Amro Depo., p. 106). Henley "storm[ed]" out of the meeting and Kreutzer told plaintiff: "God damn it, jackass, you're lucky you have a job because we have a lot of work down here." (Amro Depo., p. 108). Immediately after the meeting Henley stopped plaintiff as he headed back to his station and in an angry voice said "[Y]ou fucking foreigner, you're lucky to have a job." (Amro Aff., ¶ 34).[6] Henley then grabbed plaintiff, started going through plaintiff's jacket pockets, and attempted to search him, asking "Do you have a tape recorder?" *Id.* Plaintiff "literally ran" to an area with other people so that Henley could not attack him again. *Id.* Shortly after that incident Henley threw drawings at plaintiff and caused a paper cut to his neck. On another occasion when plaintiff was returning a drawing, Henley physically pushed plaintiff with both hands, yelling "God dammit fix this drawing." (Amro Aff., ¶ 35). Other employees observed Henley angrily shove or throw papers at plaintiff.

On April 14, 1997, plaintiff filed a grievance concerning his April 4, 1997, meeting with Henley and Kreutzer. Plaintiff alleged that Boeing had not fairly considered him for merit increases, B-totems and retention levels. Plaintiff complained that his managers had previously led him to believe that he was in a Senior Engineer position which was appropriate for a DS–4 engineer, but that they now were telling

him that he was in an entry level position that resulted in low retention ratings and low merit increases. Plaintiff also asserted in his grievance that his managers told him that the only way to improve his ratings and salary would be to transfer out of his current position.[7] Plaintiff filed the grievance because he felt that his performance management reviews "ha[d] always reflected that [his] performance is above average, but [his] salary increases indicate that [he] was a below average performer" and that even his supervisors acknowledged that his performance for Henley was outstanding. (Amro Aff., ¶ 37).

Before filing his grievance, plaintiff had verbally requested a transfer from Henley's group.[8] Plaintiff also expressed his desire to transfer in performance management reviews. Plaintiff's grievance, however, complained that Henley "appears to be unwilling to work with employee, and appears to be wanting to hand-off employee to another group." (Plaintiff Att. 1, Ex. M, p. 2).

A grievance meeting occurred on May 7, 1997. As a result of that meeting, at management's suggestion, plaintiff and his union representative (Doug Ritter) agreed to document plaintiff's career path goal by filling out a Career Transfer Request (CTR). Plaintiff submitted the CTR to Bob Ream, Boeing's personnel representative, on May 14, 1997. Ritter testified that most engineering career changes tend to be initiated by managers and that a CTR was a last resort because it could be "considered burning your bridges." [9] (Att. 19,

---

**6.** In his statement of undisputed facts, plaintiff correctly cites the source of this evidence. In contesting Boeing's statement of uncontested facts, however, plaintiff asserts that this evidence is contained in the *Pretrial Order* (Doc. # 59). Citation to the pretrial order is not proper support for purported summary judgment facts. This is but one example of plaintiff's failure to consistently cite correct record evidence.

**7.** Plaintiff admits that no more challenging positions were available in Henley's area.

**8.** Boeing had told him that he had to stay put. Henley had told plaintiff that he could not

transfer because of Vopat or Boeing's Human Resources department or because he had previously filed suit against Boeing.

**9.** Normally, when an engineer wanted to move to another position, he talked to the manager for that position and the manager asked that the employee transfer into the new group. Ritter suggested that plaintiff contact the managers of the new 767–400 program (Beahan and Pray) but plaintiff did not do so. The other new programs (737–900 and 700C) were still staffing up in September, 1997.

Ritter Depo., pp. 232–33). Plaintiff did not believe that a CTR was necessary for an interdepartmental transfer,[10] and he asserts that Boeing's suggestion that he fill out a CTR was discriminatory and/or retaliatory. Specifically, plaintiff argues that Boeing never required other engineers to complete CTR forms unless they wanted to transfer between Seattle and Wichita. Boeing produced evidence, however, that early in his career, Ritter himself had completed a CTR.

Plaintiff alleges that during 1997, Vopat, Ream and Henley "held him hostage" in the Liaison job and unlawfully blocked and delayed his transfer to other programs.[11] (Amro Depo., 31–35, 291–93). Plaintiff asserts that because Boeing required him to complete a CTR and otherwise delayed his transfer, Boeing did not consider him for positions for which he was qualified and instead hired or transferred similarly situated engineers into such positions. (Amro Aff. ¶ 59; Ex. N). Neither Vopat nor Ream had the power to keep plaintiff assigned to a specific department, however, or to force his transfer to a specific position. Henley denies that he ever did anything to prevent plaintiff from leaving his group. Plaintiff points to a bar graph which indicates that Boeing hired 37 DS–4 engineers from January 1997 through June 1997. (Amro Aff., Ex. N). Plaintiff does not identify specific instances, however, where Boeing hired or transferred identified engineers into positions for which plaintiff was qualified. Nor does he demonstrate that such engineers were similarly situated or that he was qualified for the positions in question.

In his CTR, plaintiff described his qualifications and related experience as follows:

> My qualifications are: BS, MS, & PhD in mechanical engineering. In addition, over Twelve years of experience at Boeing Engineering Departments. I want to continue my professional growth with engineering job that commensurate with my experience, education and fair salary paid.

(Defendant Att. 2, Depo.Ex 1). On May 15, 1997, the day after he received plaintiff's CTR, Ream forwarded plaintiff's CTR package to three skill code functional managers: Mitch Tibbs, for DL–1 liaison engineers, Roland Bainbridge, for DS–4 design engineers, and John Pilla, for AS–3 stress engineers. Managers who evaluate a CTR are also allowed to review the employee's online Employee Profile, Work History and attendance record. On May 19, 1997, at Ream's request, Pilla talked to plaintiff about working as a stress engineer. Plaintiff told Pilla about his past work on fatigue analysis, which was the subject of his Masters thesis and doctoral dissertation. Pilla told plaintiff that he should have taken a required Technical Excellence class.[12] Plaintiff told Pilla that he was willing to take the course if he were transferred to the stress group. Pil-

---

**10.** Marlene Titchenor, a Human Resources Assistant, had told plaintiff that interdepartmental transfers traditionally did not require a CTR.

**11.** Vopat's only responsibility was to assist employees by explaining the career transfer process. He did not have responsibility for reviewing CTR forms, and the record is not clear how he allegedly "held plaintiff hostage" in the Liaison job.

Ream misplaced plaintiff's CTR for two weeks in May 1997.

As to Henley, plaintiff complains that Henley characterized his CTR—which stated that plaintiff wanted to "continue [his] professional growth" within an engineering job that was commensurate with his "experience, education and fair salary paid"—as unclear. (Defendant Att. 2, Depo.Ex. 1). Plaintiff also complains that Henley told Tibbs that plaintiff was not qualified for MRB (Liaison) positions because he had medical restrictions, and that Henley did not assist him in transferring, leaving CTR as plaintiff's only recourse. Henley also told plaintiff that Vopat was "pissed off" and that Vopat was so mad at plaintiff that he was not going to be able to move out of the Liaison group.

**12.** Other engineers have worked as AS–3 engineers without taking the course, and Boeing has not produced evidence that Technical Excellence is a required course for an AS–3 position.

la determined that plaintiff was not prepared to do stress analysis. Pilla also was disinterested in plaintiff because plaintiff's memorandum contained poor grammar and syntax, and a stress engineer must produce clear and concise written documentation. Pilla did not directly raise this issue, however, with plaintiff.[13]

In a telephone conversation on May 23, 1997, Bainbridge asked plaintiff to clarify his qualifications.[14] Also on May 23, Mitch Tibbs, the functional manager for Skill Code DL–1, notified plaintiff that Henley supervised the only positions which were available in Tibbs' group.[15] In addition, on May 23, Ream told plaintiff that because of his medical restrictions he could not work in any DS–4 engineer position that required use of CATIA.[16] As noted above, plaintiff asserts that his medical restrictions only prohibited him from using a personal computer and did not apply to CATIA, which uses a large screen and has zoom capability. In any event, on June 11, 1997, plaintiff's doctor clarified the restrictions to explicitly state that plaintiff could use CATIA.

On June 18, 1997, the day after he received plaintiff's clarification of his qualifications, Bainbridge advised plaintiff that he was not aware of immediate DS–4 job openings except in DCAC.[17] On July 7, 1997, plaintiff responded through Ritter, his union representative, that he was not interested in working in DCAC but was interested in new programs such as 767–400 ER Section 41, the 747 determinant assembly effort and the new 737–900 or CX programs. On August 4, Bainbridge responded that Boeing was in the process of identifying manpower requirements and funding levels for the new programs and that he would consider plaintiff for openings in the new programs as appropriate positions opened. Plaintiff asserts that in July and August of 1997, Boeing placed Todd Perfito, Bang Pham and Farhad Tadayon in DS–4 positions for which he was qualified. Plaintiff does not cite any evidence, however, of the relative qualifications of the four individuals or the race, national origin, or disability status of those who were hired.

On September 10, 1997, plaintiff asked Vopat about the status of his transfer. Vopat met with plaintiff that day and told him that he would work on finding him a position. A month later, on October 13, 1997, plaintiff interviewed for a design position beginning in November in Terry Nunemaker's DS–4 group. On about October 17, 1997, Boeing offered plaintiff the

13. In response to paragraph 17 of defendant's statement of facts, plaintiff refers to *Mitch Tibbs*, the Functional Manager for Skill Code DL–1. The record in support pertains to *Pilla*, however, and in context it is clear that plaintiff intends to refer to Pilla.

14. Plaintiff responded in a letter dated June 4, 1997. Part of plaintiff's response read: "You stated that you have received a letter from Mr. Bob Ream stated [sic] that I want to transfer to DS4, but the letter and the request is not clear and you need a clarification of that. you [sic] further stated if I am still willing to work in DS4." (Att. 1, Amro Dep., pp. 323–34, Att. 2, Depo.Ex. 17.)

15. Plaintiff asserts that other positions were available and that Boeing hired or transferred other similarly situated engineers into them, but he cites no record evidence in support of his conclusory statement. (Amro Depo., p. 139). On May 16, 1997, Tibbs sent Ream an e-mail which stated:

I received the CTR for Joe Amro. I spoke with Randy Henley his current supv. And he said that Joe has several medical restrictions that prevent him from working MRB (Liason). Therefore I am shredding his CTR. His bet would seem to be a DS4 designer or an AS3 stress analyst.
Thanks.
Henley Deposition Exhibit 70.

16. Plaintiff asserts that other "similarly situated engineers" were allowed to work in DS–4 positions even though not trained to use CATIA, but he does not name any such engineers. (Amro Aff., ¶ 53).

17. Plaintiff's affidavit claims that other DS–4 engineer positions were available during that time frame. He cites no evidence of such positions, however, other than his conclusory statement that "I remember that there were advertisements in the Boeing News for DS–4 engineers during that time frame." (Amro Aff. ¶ 49).

position. He accepted it and agreed to take CATIA classes before assuming the position. Five months elapsed from the time plaintiff submitted his CTR to the time of his transfer. Had he been willing to accept any available position, he likely would have been transferred sooner. Plaintiff complains, however, that Boeing suggested that he identify specific jobs, thus narrowing his transfer request.

Since November 3, 1997, plaintiff has worked on the 737 Next Generation project. Plaintiff likes his job and has no complaints about his current supervisor, Michael Horton, or job duties. His duties involve modifying pre-existing design, the type of work plaintiff wanted to do at Boeing.

### Boeing's Salary Adjustment Program For Engineers—Background

Since December 6, 1989, professional engineers at Boeing have been in a bargaining unit which is subject to a series of collective bargaining agreements. The current Collective Bargaining Agreement (CBA), which covers the period from 1995 to 1999, is between Boeing and the Seattle Professional Engineering Employee's Association (SPEEA). It provides that on an annual basis, Boeing will selectively increase the salaries of eligible employees in the bargaining unit. For each year's salary exercise, Boeing establishes a fund by multiplying the sum of the eligible employees' salaries by a percentage set forth in the CBA. The CBA set those percentages at 4.0 percent for 1997, 4.5 percent for 1998, and 5.0 percent for 1999.

The CBA establishes the source and percentage of the fund which will be devoted to raises, and Boeing allocates the funds among individual engineers.[18] The CBA does not guarantee that any specific engineer will receive a raise. During the

1997, 1998, and 1999 salary adjustment exercises, 383, 396, and 363 DS–4 engineers, respectively, were eligible to share in the funds. Eligibility depends on the employee's placement on Boeing's final salary totems. Salary totems are compiled through the salary adjustment process, numerous meetings of working level supervisors and managers, and meetings of the larger totem committee. As part of the process Boeing breaks the large group of DS–4 engineers into smaller "peer" groups which are composed of engineers who have similar experiences, acquired skills, capabilities and B.S. Equivalent years. B.S. Equivalent years are generally defined as the number of years of engineering-related experience which the employee has acquired since receiving a B.S. degree.

Boeing compares engineers within each peer group, using five specific performance assessment criteria, as follows:

a. Accumulation of responsibility;

b. Accumulation of skills;

c. Leadership;

d. Quality and quantity of work; and

e. Attitude.

(Defendant Att. 3, Henley Depo., p. 62; Defendant Att. 2, Dep.Ex. 55–A). These performance criteria are intended to evaluate the relative performance of different engineers, over the course of their entire careers. Years of service with Boeing and education levels are not factors in the performance ratings.[19] Also, Boeing does not use annual Performance Management documents as the basis for the comparisons, because they simply define goals and expectations for one year. Plaintiff asserts that the Performance Management documents offer an objective and valid view of an engineer's performance, however, and

---

18. In any year, Boeing has the right to supplement the bonus pool with separate funds. It did with "targeted fund increases" in 1996 and 1997.

19. Plaintiff cites Vopat's testimony that education can affect how well an engineer is able to perform any one of the five criteria; thus,

an advanced degree may help an employee perform better than peers without such degrees. Vopat does not participate in performance evaluations, however, and he has no input into any engineer's salary. He serves as a go-between for the decision makers and Boeing's compensation department.

points out that under the CBA the Performance Management Process is designed to **promote effective communication about** performance and those factors that contribute to or are affected by performance, such as: job responsibilities, performance goals and expectations, an appraisal of performance, noting accomplishments and any areas requiring improvement, career development goals, **the effect of performance on opportunities for selective salary adjustments,** the effect of performance on retention index, etc.

Plaintiff Att. 17 (emphasis added).

### The Salary Exercise

To begin the salary exercise, the immediate supervisors of a particular organization or responsibility center meet to discuss the relative performance of engineers within their immediate organization. At these "working-level" meetings, based on the five criteria, supervisors rank engineers by their performance relative to other engineers in their group.[20]

Working-level meetings usually begin with a review of the engineers' relative performance stack from the previous year, to verify that all information is correct and to determine if there should be any movement. The working-level group may discuss potential target salaries, using the previous year's target salary as the starting point. Some managers recommend what they deem to be target salaries for each engineer under their supervision. The working level group then selects a "focal" or representative to attend totem committee meetings at which all engineers on the DS–4 totem are integrated into a single totem and ranked by relative performance.[21]

At the larger totem meetings, focals and representatives from each of the working groups attempt to reach a consensus regarding the relative performance of all DS–4 engineers within each peer group. During these discussions, a list of B.S. groupings is displayed either on overheads or by projection from a computer screen. The B.S. groupings consist of those engineers with the same B.S. Equivalent year. Managers first discuss whether engineers within each of those groupings are stacked appropriately using the five performance criteria. If not, by agreement, adjustments can be made. Several different drafts or solutions of the relative performance rankings are run before the group considers target or actual salaries. The group double checks the data three different ways: first, it scrutinizes the overall order of the entire totem population; second, it compares the groupings three to four years on either side of each B.S. year; and third, it looks at each single B.S. year to ensure that employees are stacked appropriately by performance. As different solutions are generated, the focals or representatives communicate the progress of the meetings to the working-level groups.

Once the relative performance stack is established, the totem committee turns its attention to target salaries and relative salary comparisons. At the first step, a

---

20. Plaintiff asserts that supervisors establish "appropriate salary relationships" by identifying target salaries for individuals in each peer group, based on one question: should employee A be making more than employee B? Plaintiff bases this claim on a misreading of deposition testimony by Vopat. According to Vopat, the process is not that simple. Vopat testified that the compensation pay for performance system uses target salaries. Target salaries are determined by looking at engineers in a peer group, then applying the five performance criteria to establish salary relationships. (Vopat Depo., p. 40–56). Further, although plaintiff cites Vopat's testimony for the proposition that the system is subjective,

Vopat in fact testified that the process is designed to be as objective as possible, although evaluation by its nature "is always going to have some subjectivity." (*Id.*, p. 56). According to Henley, to the extent that Boeing's Compensation Pay for Performance procedure attempts to measure the value of the employee to the company, it is "by its very essence, subjective judgment." (Henley Depo.Ex. 55–A).

21. Plaintiff asserts that at this stage the engineers in each peer group are ranked in descending order by "appropriate salary relationships."

software program generates an initial straw-horse target salary for each engineer. The straw-horse target salary is based upon the engineer's previous year salary, the amount of the current year's fund, and regional and national market data which is built into the software. Boeing's software assumes a certain salary spread between the top and bottom performers and it contains built-in limitations based on the size of the fund. A number of target salary changes throughout the process generate many different solutions.

During these meetings, the focals and representatives reach consensus on final target salaries and actual salary increases. No single supervisor has the power to unilaterally determine an individual salary; all managers at the totem committee meeting must reach consensus. Managers at the totem committee meeting review different solutions as they are run and discuss whether the resulting salaries are appropriate. The overall goal is to ensure that based on the five performance criteria, the resulting salary relationships are appropriate.

### Plaintiff's Salary Exercise—1997

The Wide–Body responsibility center was the working-level group that initially considered plaintiff in early 1997. At the time of the 1997 DS–4 salary review, Henley was plaintiff's immediate supervisor. He represented plaintiff at the working level meetings, but his only input was at the working group level. Henley had only two DS–4 engineers (plaintiff and Kevin Smith), and in evaluating their performance, he used the five performance criteria. While Smith had more leadership responsibilities than plaintiff, plaintiff had greater technical skills than Smith. Henley therefore ranked Smith and plaintiff equivalent in accumulation of skills.[22] Henley testified that plaintiff put out a lot of work and that his work quality was

good, with probably no more returns than Smith. He ranked Smith higher on leadership and accumulation of responsibility. Henley also ranked Smith and plaintiff equivalent on attitude. Based on the five criteria, Henley judged Smith a better performer because he had lead responsibilities and more duties than plaintiff.

As a result of the 1997 exercise, plaintiff received a raise of $1700, or about 4.2 percent—a figure slightly higher than the fund percentage. In October 1997, Boeing had 303 DS–4 engineers, and 92 percent of them received salary increases greater than plaintiff. (Amro Aff. ¶ 66). The average salary adjustment was 10.3 percent for engineers in the targeted low experience group and 6.3 percent for the entire totem group. Henley was aware of two or three other engineers on the DS–4 totem who had the same number of experience years as plaintiff. He considered plaintiff's position at the bottom of the ranking for his peer group to be appropriate.

### Plaintiff's Salary Exercise—1998

Eric Fischer became plaintiff's supervisor when plaintiff transferred to the 737 New Generation (737NG) design group November 1997. Fischer was plaintiff's immediate supervisor at the time of the 1998 salary exercise. Fischer also acted as the focal for the Single Aisle Fuselage responsibility center, and represented plaintiff at the 1998 totem committee meetings.

Fischer evaluated plaintiff as performing well, yet rated him in the bottom third of engineers in the group. While plaintiff was doing a quality job and meeting a schedule, he was also learning new skills. Fischer stated that plaintiff was merely "present" at work; he did not volunteer; he had to be told what to do and guided through the work. Fischer also evaluated plaintiff as handling simple but not com-

---

**22.** Plaintiff points out that he and Smith were not evaluated together because Smith's B.S. Equivalent Year is 1983; plaintiff states that he should have been compared with engineers with a B.S. year of 1985. But Boeing does not assert that Smith and plaintiff were evaluated together. Rather, Henley made the comparisons between plaintiff and Smith's performance in response to deposition questions posed by plaintiff. Boeing does not assert that Smith and Henley were in the same peer group.

plex tasks and not understanding the big picture, and described him as "just like a junior engineer."[23]

The initial straw horse for March 1998 gave plaintiff a salary increase of only about $500. Ultimately, plaintiff received a raise of $2450, or 5.8 percent, even though the CBA pool was only 4.5 percent. Plaintiff states that other similarly situated engineers in his peer group, whose job performance was not as good as his, received better rankings on the B-totem. He does not point to specific evidence in support of this contention, and in fact he testified that Fischer did not discriminate or retaliate against him.

Plaintiff's rating on the totem in March 1998 was 308 out of 396, which placed him in the bottom 23 percent of DS–4 Skill code engineers. The highest paid engineer in plaintiff's peer group, Patrick Novak, had a target salary of $64,450.00—$19,800.00 higher than plaintiff's. Plaintiff's salary for 1998 was $11,276 less than the average salary for engineers in his peer group. Four engineers in plaintiff's peer group of 24 engineers are listed as racial minorities. Of those four, Kenny Khuong received a raise of $2,750, Peter Ly received a smaller raise than plaintiff, and Bekele Asrat did not receive a raise.

In 1998 plaintiff earned less than engineers who had less experience. Of the 127 DS–4 engineers with B.S. equivalent years ranging from 1985 to 1992, only five had lower salaries than plaintiff. Of those five, Boeing lists two as racial minorities. One, Zouheir Zheeb, is not listed as a minority but is a Lebanese from Beirut.

*Plaintiff's Salary Exercise—1999*

For the March 1999 salary review, plaintiff worked under supervisor Mike Horton

and lead Eric Sevart. Horton relies on his leads to provide input regarding the actual performance of engineers under him. Sevart told Horton that plaintiff initially did not have the CATIA skills that other engineers did. The 737NG design group was doing a lot of solid modeling and two-dimensional drawing, and while plaintiff was proficient in 2–D drawing, he was still learning solid modeling. Sevart also told Horton that plaintiff's performance was below that of Donna Boatner but above that of Steve McKenzie. Plaintiff has a B.S. Equivalent year of 1985. Boatner is an African–American female with a B.S. Equivalent year of 1987. Steve McKenzie is a Caucasian male with a B.S. Equivalent year of 1994.

At the start of the 1999 salary exercise, the software slated plaintiff for no raise at all; his initial straw-horse target salary was below his existing salary. This was not satisfactory to Horton, so he met with the focal, David Marshall, and made a presentation to the totem committee to get a raise for plaintiff. Horton told the committee that plaintiff's performance had improved and that even though plaintiff was at the bottom of the performance stack in his peer group, his performance warranted an increase.

Plaintiff asserts that his position at the bottom of the peer group did not accurately reflect his actual performance relative to his peer group. In support, plaintiff cites his affidavit statements to the effect that he is one of the more experienced Senior Engineers in his group and that he spends a significant amount of time assisting co-workers with CATIA and other technical problems. He notes Stevart's e-mail statement that plaintiff's work is above average.[24]

---

**23.** Plaintiff attempts to rebut Fischer's evaluation, in part by pointing to an e-mail from Eric Stevart, plaintiff's lead engineer on a particular installation project, to Fischer. In the e-mail, Stevart stated that plaintiff has a "significant amount of engineering experience" and that the quality of his work was above average. (Plaintiff Att. 1, Ex. R). Stevart also stated, however, that plaintiff had

very little CATIA design experience when he transferred, and that he was steadily improving. Stevart further stated that plaintiff had problems with communication.

**24.** Plaintiff also cites Horton's declaration that according to Sevart, plaintiff's work was above that of McKenzie. Plaintiff fails to note, however, that McKenzie's BS Equiva-

After considering the information provided by Horton, the totem committee agreed to a $2,200.00 increase for plaintiff. This amounted to a 4.9 percent increase, raising plaintiff's salary to $46,850. Horton considered plaintiff's increase fair. Plaintiff believes that the salary does not accurately reflect his performance relative to other engineers in his peer group. He testified, however, that neither Horton nor Sevart discriminated or retaliated against him.

Plaintiff's totem ranking for March 1999 was 274 out of 364, which placed him at the bottom 25 percent of DS–4 Skill code engineers. When compared to a group of 19 DS–4 engineers with B.S. Equivalent years of 1985, plaintiff's ranking on the B-totem was at the very bottom. The average 1999 salary for these engineers, not including plaintiff, was about $60,000.

### Out of Sequence and Targeted Raises

Plaintiff claims that prior to the March 1997 exercise, he should have received an out-of-sequence or targeted raise. In December 1996 and January 1997 a limited number of DS–4 engineers received targeted supplemental funds based on two specific criteria: (1) engineers with eight years or less experience, and (2) engineers with specific critical skills that the company did not want to lose.[25] At the time, plaintiff had been at Boeing for more than eight years, so he did not qualify under the first criteria. Henley stated that he did not believe that either of his DS–4 engineers (plaintiff and Kevin Smith) met the criteria for targeted funds. According to Vopat, plaintiff could have received the targeted funds had management determined that he had critical skills that it did not want to lose.

Smith is not foreign born and he does not speak with an accent. Smith received a $2,650.00 raise, almost $1,000.00 more than plaintiff, even though Smith was not proficient at CATIA. Out of approximately 383 engineers on the DS–4 totem on March 4, 1997, only 34 received supplemental targeted or out-of-sequence raises.

### Retention Rating System

As a tool to help decide which employees to retain if layoffs become necessary, Boeing assigns retention ratings each year. If no layoffs occur, the ratings are irrelevant. Throughout the majority of his career at Boeing, even prior to the time he filed his first lawsuit, plaintiff has had a retention rating of four. Since March 1997, plaintiff has been a union council representative for the Seattle Professional Engineering Employee's Association (SPEEA). The CBA provides special protection for SPEEA council representatives. Article 12.1(h)(1)a provides that council representatives will be presumed to have an adjusted retention rating of one while they are council representatives.

### Plaintiff's Harassment Claim—April 1997 Meeting with Henley and Kreutzer

During his April 4 meeting with Henley and Kreutzer, plaintiff told them that he felt they were unlawfully discriminating against him. Henley threw some paper on the desk saying "dame [sic] it that is your problem it is your restriction which eliminate your growth within the company as long as your restriction remained on file." Plaintiff states that Henley stormed out the door very angrily saying that he was "not going to deal with Fuking [sic] Bullshit anymore." Kreutzer then looked at him very angrily and said "Jackass, you [sic] lucky we have a lot of work at present time."

Immediately after the meeting ended, Henley told plaintiff "Fucking foreigner. You're lucky you have a job." Henley put

---

lent year was *1994*—reflecting nine fewer years of experience than plaintiff.

**25.** At the time, as the result of recruitment activities from other companies, Boeing had a high attrition among key individuals in critical skills. Management identified people who, because of performance, were key resources that Boeing wanted to protect. Boeing instructed managers to award targeted and annual raises without considering race, gender, age, national origin or disability.

his hands on plaintiff's neck and patted plaintiff down, asking him whether he had a tape recorder. (Att.1, Pltf.Depo., pp. 50, 52, 56). A few days later Henley threw drawing papers at plaintiff, and plaintiff got a paper cut on his neck.

On another occasion, plaintiff was leaving work. Henley yelled at him and said that he wanted to search plaintiff to see what he had in his brown folder. Henley took the folder, looked through it, returned it to plaintiff and said "You can go now." Plaintiff was shaking, and testified that the search was humiliating. (Amro Depo., pp. 63–66)

Another time, when plaintiff did not respond to him, Henley said "Damn it. Are you deaf? Turn it up grandpa." [26] (*Id.*, p. 87). Another time, when plaintiff and Henley were on the shop floor, Henley said "Come on with me. You're getting too old," when plaintiff lagged behind. (*Id.*, pp. 91–92).

### Plaintiff's Medical Restrictions And Health

In November 1994, plaintiff was released to work after a long period of medical leave related to an on-the-job injury he had suffered at Boeing. He had several permanent medical restrictions, including,

(a) May use medical parking; (b) May occasionally (0–33%) climb stairs; (c) No working in high-noise areas (more than 85dB); (d) May walk 66 yards at a time; (e) No climbing ladders; (f) 15 minutes away from desk each hour; and (g) Use of computer screen not greater than 50% of shift.

(Amro Aff., Ex. O).

Plaintiff has some hearing loss in both ears. He sometimes wears hearing aids, though he is able to function without them and usually does not wear them. When plaintiff does wear his hearing aids, he hears fine. Plaintiff has hand and leg numbness that is sometimes so severe that he cannot drive himself to work. The numbness does not interfere with his ability to work, however, and plaintiff is allowed to get up and stretch when necessary.

Plaintiff also suffers from dry eye syndrome, and can only make limited use of a small screen personal computer. Plaintiff can perform and has performed the essential functions of his position as DS–4 engineer. Plaintiff continues to require time off work for medical treatment and rehabilitation.

### Filing of Claims

Plaintiff filed his first suit on March 29, 1996. This Court dismissed it on January 7, 1997. *See Amro I*, 951 F.Supp. 1533. During the course of his employment with Boeing, plaintiff had filed complaints of discrimination based on national origin, race, color and disability. Vopat, Ream, Kreutzer and Randy Henley were aware that plaintiff had filed these complaints. On August 6, 1997, seven months after the Court dismissed his first case, plaintiff filed a further EEOC complaint, alleging job discrimination based on color, national and ethnic origin, and disability, and retaliation.

On June 10, 1998, plaintiff filed his complaint in this case, alleging race, color and national origin discrimination and retaliation in violation of Title VII and Section 1981, and disability discrimination in violation of the ADA. In its motion for summary judgment, Boeing claims that as a matter of law, it is entitled to judgment on each of plaintiff's claims.

### *ANALYSIS*

**I. PLAINTIFF'S CLAIMS OF RACE, COLOR AND NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF TITLE VII and 42 U.S.C. § 1981**

Boeing asserts that some of plaintiff's complaints—*i.e.* those about his work in the liaison engineering position, his aggregate salary, and the interpretation of his medical restrictions—are complaints about the present effect of past actions that were

---

**26.** Plaintiff sometimes wears a hearing aid.

or should have been included in the prior lawsuit. The Court reserved for summary judgment the issue whether res judicata or claim preclusion doctrines bar such claims because they represent the present effects of past, nonactionable decisions. *See Memorandum and Order* (Doc. # 49) filed January 15, 1999 at 4 n. 1. The Court agrees, however, that three of plaintiff's claims are consequences of decisions that he either included or should have included in the previous lawsuit: his claim that Boeing forced him to work in Liaison Engineering between 1994–1997; his claim for aggregate salary losses; and his claim that Boeing misinterpreted his medical restrictions.

 Res judicata, or claim preclusion, precludes a party from re-litigating issues that were or could have been raised in an earlier action, if the earlier action concluded with a final judgment on the merits. *King v. Union Oil Co.,* 117 F.3d 443, 445 (10th Cir.1997). Res judicata is an affirmative defense on which defendant has the burden to set forth facts sufficient to satisfy the elements. *See* Fed.R.Civ.P. 8(c); *Nwosun v. General Mills Restaurants, Inc.,* 124 F.3d 1255, 1256 (10th Cir.1997). For the doctrine to apply, four elements must exist: (1) a judgment on the merits in the earlier action; (2) identity of the parties or privies in the two suits; (3) identity of the cause of action in both suits; and (4) a full and fair opportunity for plaintiff to litigate the claim in the first suit. *Id.* at 1257.

## A. Liaison Engineering Position

 As noted above, plaintiff claims that Boeing kept him from transferring out of Liaison Engineering from 1994–1997. Boeing asserts that this claim is barred because it focuses on plaintiff's placement in Liaison Engineering in 1994. The Court agrees that to the extent that plaintiff's present complaint is based on his placement in Liaison Engineering in 1994, it is barred by res judicata. The first two elements of res judicata are clearly met. Further, in *Amro I,* plaintiff litigated the same cause of action—that is, claims of

employment discrimination by Boeing during 1994, 1995 and the first three months of 1996. To the extent that plaintiff raises a claim about denial of a transfer and harassment in the liaison engineering position *after* March 1996, however, those claims are not barred by res judicata (claim preclusion).

Defendant also asserts that to the extent plaintiff suffered damages in 1997–1998 which flowed from his placement in 1994— a placement litigated in *Amro I*—his claim is not actionable. The present effects of past employment decisions do not present separate claims. *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). In *Evans,* a flight attendant was discriminatorily fired and rehired years later. After the rehire, plaintiff filed suit, based on the theory that her time out of the job had resulted in low seniority upon rehire. The Supreme Court rejected this theory, distinguishing present discrimination from the present effects of a past violation. *Id.* at 555, 97 S.Ct. 1885. Again, the Court agrees that to the extent that plaintiff asserts his salary is discriminatory based on Boeing's actions before March 1996, that claim is subsumed in *Amro I* and is not actionable here. To the extent that plaintiff alleges new actions by Boeing after March 1996 in denying him a transfer or otherwise treating him in a discriminatory manner, such claims are not barred here.

## B. Aggregate Salary

 Boeing argues that plaintiff's aggregate salary level is built on past salary exercises from 1984 through 1996, and that those issues were adjudicated in the previous lawsuit. *See Amro I* at 1551–52. Boeing concludes that by definition, a claim for discriminatory aggregate salary includes past salary decisions and that plaintiff's aggregate salary claim is not actionable. In *Dasgupta v. University of Wisconsin Board of Regents,* 121 F.3d 1138 (7th Cir. 1997), a foreign-born employee complained that his salary never caught up with the

salaries of his peers. The Seventh Circuit faced the issue whether a claim based on aggregate salary is barred if the salary results from historical, non-actionable decisions, or whether a Title VII claim for aggregate salary may be brought at any time by alleging a disparity in salary. The Seventh Circuit concluded that aggregate salary was the lingering effect of past decisions and was therefore not actionable. By contrast, annual decisions about raises give rise to new causes of action based on new discriminatory conduct. The Court agrees with this reasoning, and finds that to the extent plaintiff claims that his aggregate salary is discriminatory, such a claim is barred by *Amro I.* In contrast to his aggregate salary, however, plaintiff's annual raises are actionable because they are discrete decisions made each year by the group of managers given the assignment for that year.

## C. Medical Restrictions

As noted above, plaintiff claims that Boeing restricted his transfer opportunities by misinterpreting his 1994 medical restrictions. Boeing asserts that this claim is barred because it could or should have been a part of *Amro I.*

In this suit, plaintiff complains that Boeing construed his medical restrictions in a way that restricted his used of CATIA—a restriction which limited his opportunities for working in a design engineering position. Boeing's interpretation of plaintiff's computer restriction was consistent, however, from 1994 to July of 1997, when plaintiff's doctor removed the restrictions on computer use so that plaintiff could use CATIA more than 50 percent of his shift. From 1994 to July of 1997, plaintiff's restrictions were the same. Any problems arising from misinterpretation were present results of past decisions.

## D. Plaintiff's Claim of National Origin and Race Discrimination

Defendant asserts that plaintiff's rare claim under Section 1981 is insufficient as a matter of law because it does not allege discrimination based on ancestry or ethnic characteristics. Plaintiff claims that Boeing discriminated against him because of his accent, because he was born in Lebanon, and because of his dark complexion. Boeing points out that allegations of discrimination based on birthplace or accent are not actionable under Section 1981. *See Shinwari v. Raytheon,* 16 F.Supp.2d 1308, 1312, n. 2 (D.Kan.1998) (birthplace not protected under § 1981); *Bradford v. Hawaii,* 846 F.Supp. 1411, 1418–19 (D.Haw.1994) (language not racial characteristic); *see also Hernandez v. New York* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (decision based on language is not necessarily based on race); and *Amro I,* 153 F.3d 726, 1998 WL 380510 at *2 n. 3 (while accent may be relevant to national origin discrimination, it does not follow that it is relevant to race discrimination). In *Amro I,* however, the Tenth Circuit noted that Section 1981 does not protect against discrimination based on national origin, but considered plaintiff's claims of "discrimination based on his Lebanese ancestry to fall within § 1981's protection against racial discrimination." 153 F.3d 726, 1998 WL 380510, *1 n. 2 (citing *Aramburu v. Boeing,* 112 F.3d 1398, 1411 n. 10 (10th Cir.1997)). Further, in this case plaintiff has alleged that Boeing classified him as either Asian or Southeast Asian; thus plaintiff has alleged that Boeing believed he was a non-white. *See Alizadeh v. Safeway Stores, Inc.,* 802 F.2d 111, 114 (5th Cir.1986).

## E. Transfer

■ In order to set out a prima facie case of employment discrimination, plaintiff must show (1) that he is a member of a protected class, (2) that he was qualified for a certain position, (3) that he did not receive the position for which he was qualified, and (4) that the position remained open or was filled from outside the protected class. *See Reynolds v. School Dist. 1,* 69 F.3d 1523, 1534 (10th Cir.1995). Plaintiff has identified several available positions for which he was allegedly qualified and to which he was not hired in the

summer of 1997. Except to show that none of those hired were Lebanese, however, plaintiff has failed to present any evidence regarding the race or national origin of the successful applicants.[27] The Court does not believe that the protected class can be defined as narrowly as plaintiff would have it: dark-skinned Lebanese. Boeing is entitled to summary judgment on plaintiff's 1981 and Title VII claims based on denial or delay of transfer.

### F. Salary Increases

Plaintiff has offered no direct evidence of national origin or race discrimination related to his pay increases. The Court notes that Henley called plaintiff a "fucking foreigner" several months after the salary exercise in January 1997. Boeing, however, notes that plaintiff has not shown that the remark was connected to the 1997 pay decision. *See Equal Employment Opportunity Commission v. Wiltel, Inc.,* 81 F.3d 1508, 1514 (10th Cir.1996) (statements which are merely expressions of personal opinion or bias do not constitute direct evidence of discrimination and at most are circumstantial evidence of discriminatory intent). Thus plaintiff must rely on the indirect method of proof.

■ Under *McDonnell–Douglas,* in order to prove a prima facie case of national origin or racial discrimination under Title VII or Section 1981 with regard to salary increases, plaintiff must point to evidence that (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for certain raises; (3) plaintiff did not receive the raises for which he was qualified; and (4) plaintiff was treated less favorably than similarly-situated persons outside the protected class. *See Amro I.,* 951 F.Supp. at 1533. Plaintiff satisfies the first element under Title VII and Section 1981, because he claims his protected class is that he was

born in Lebanon and Boeing considered him to be non-white. Boeing, however, asserts that plaintiff has no proof that he "qualified" for any larger raises than the ones he received.

■ Essentially, the question is whether plaintiff received lower raises than similarly situated engineers who were performing similar work. *See Poore v. Rooks County,* 34 F.Supp.2d 1275, 1279 (D.Kan.1999) (plaintiff must show similarly situated to preferentially treated employees in all material respects). Unfortunately for plaintiff, although he has identified others who allegedly are similarly situated engineers, he has not provided any evidence of their performance, training, education or skills. *See Amro I,* 951 F.Supp. at 1551. As in *Amro I,* plaintiff's own opinion that his performance is excellent does not raise a fact question as to how his performance compares to others. Further, even though plaintiff's managers may have thought that he performed well, such evidence does not allow any comparison to other employees.

### G. Out–of–Sequence Raise

■ In order to prove a prima facie case of discrimination with respect to his failure to receive an out-of-sequence raise, plaintiff must demonstrate that he was qualified to receive the funds, and that others who were similarly situated and outside of his protected class received them. *Garcia–Harding v. Bank Midwest, N.A.,* 964 F.Supp. 1492, 1508 (D.Kan.1997). The targeted raise funds were directed to engineers with less than eight years experience (a category which did not include plaintiff) or engineers with unique skills whom Boeing wanted to retain. Plaintiff has not produced evidence that he possessed critical skills that Boeing wanted to maintain. Plaintiff points out that five

---

**27.** Plaintiff also appears to assert his claim as a "delay in transfer" pointing out that it took over five months for him to obtain a transfer. He points to Henley's failure to help him transfer, and asserts discrimination on that basis. He also asserts that his managers mentioned his medical restrictions to discourage other managers from considering him, and required him to "clarify" his CTR. In the end, however, his delay of transfer claim also fails because plaintiff has not shown any evidence of how long it usually takes to obtain a transfer.

engineers with his years of experience received targeted funds. His evidence also demonstrates, however, that twenty other engineers did not receive targeted funds. As Boeing points out, plaintiff fails to produce any evidence about how his skills compared to the skills of the engineers who did receive the funds. Thus he cannot show that he was similarly situated to those engineers.[28]

## II. RETALIATION CLAIMS

■ Plaintiff alleges that Boeing managers retaliated against him for filing his 1996 lawsuit, in violation of Section 1981 and Title VII. In order to establish a prima facie case of retaliation under Title VII or Section 1981, plaintiff must show that (1) he engaged in protected opposition to Title VII discrimination; (2) he suffered an adverse. employment action contemporaneous with or subsequent to such opposition or participation; and (3) a casual connection links the protected activity and the adverse employment action. *Penry v. Federal Home Bank of Topeka*, 155 F.3d 1257, 1263 (10th Cir.1998); *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1513 (10th Cir.1997).

■ Boeing asserts that plaintiff did not engage in protected activity. It argues that plaintiff's EEOC charge in 1997 was not protected activity because he could not have had a subjectively and objectively reasonable belief that the practice which he opposed was discriminatory. *See Shinwari v. Raytheon Aircraft Co.*, 16 F.Supp.2d 1308, 1320 (D.Kan.1998). Boeing also argues that by the time he filed his EEOC complaint in August 1997, he knew that this Court had found no evidence of discrimination in Boeing's Pay for Performance System. Despite the fact that plaintiff's first lawsuit was ultimately unsuccessful, however, the Court cannot find that plaintiff did not engage in protected activity. *See Jeffries v. State of Kansas, Dep't of Soc. and Rehabilitation Servs.*, 147 F.3d 1220 (10th Cir.1998) ("A plaintiff may maintain an action for retaliation based on participation in a protected proceeding regardless of whether the conduct forming the basis of her underlying complaint is adjudged to violate Title VII.").

■ Boeing next argues that plaintiff cannot show adverse action in the amount of his salary raises in March 1997, 1998 and 1999. As Boeing points out, plaintiff's raise percentage in 1997 was close to the merit pool average, and his 1998 raise exceeded the average. Also, Boeing increased plaintiff's 1999 raise after his supervisor made a special request. Thus Boeing asserts that the raises which it afforded plaintiff cannot be viewed as "adverse action." Plaintiff, on the other hand, points out that "[i]n recognition of the remedial nature of Title VII, the law in this Circuit liberally defines adverse employment action." *Jeffries*, 147 F.3d at 1232 (10th Cir.1998). Plaintiff argues that his treatment by Henley and Kreutzer (including Henley's statement to plaintiff: "You fucking foreigner, you're lucky to have a job") is evidence of retaliatory animus. Plaintiff, however, must still show adverse job actions. He attempts to do so by pointing to his raise in 1997, which was lower than average. Plaintiff's primary complaint, however, is that despite his raises his salary is no higher than the twenty-third percentile rank. The problem is that, as analyzed earlier, plaintiff has not shown that his performance merits a higher ranking.[29]

---

**28.** It is troublesome to the Court that Henley testified that he did not believe that plaintiff was eligible for the target funds because he had more than eight years of experience, while five peers who also had more than eight years did receive such funds.

**29.** Further, plaintiff concedes that neither Fischer (the supervisor who participated in the 1998 salary exercises) nor Horton (the supervisor who participated in the 1999 salary exercises) retaliated against him. Thus, the 1997 raise, when Henley was his manager, is the only adverse job action—other than harassment—of which plaintiff complains.

Although the Court cannot condone Henley's treatment of plaintiff in the spring of 1997—the "fucking foreigner" statement, the attempted search of his jacket, the throwing of papers at him in an angry manner—such treatment without more did not materially affect the terms and conditions of plaintiff's employment. It was not severe or pervasive enough to be an adverse employment action. *See Colter v. Dobski & Assoc., Inc.,* 35 F.Supp.2d 824, 828, n. 1 (D.Kan.1999); *Sanchez,* 164 F.3d at 533.

Relying on *Bowers v. Bethany Med. Ctr.,* 959 F.Supp. 1385 (D.Kan.1997), plaintiff asserts that he has set forth a prima facie case of retaliation. In *Bowers,* the plaintiff presented evidence that she had filed claims of discrimination and then missed more than a year of work on disability leave. Shortly after she returned to work, supervisors harassed and ridiculed her. One supervisor used racial epithets about her in front of colleagues and indicated an intent to "get rid of her"; another supervisor warned her not to get involved in personnel matters and yelled at her in front of a group of employees. The court found that the plaintiff had made out a claim of retaliation. In *Bowers,* however, the defendant fired the plaintiff shortly after she returned to work. Plaintiff in this case has not shown any adverse employment action, and does not appear to assert an independent hostile work environment claim. Even if he made such a claim, Boeing correctly points out that plaintiff has not alleged nor pointed to any facts that Henley's behavior unreasonably interfered with plaintiff's work performance, or shown that Henley's misconduct was frequent. *See Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Thus the Court must find that plaintiff has failed to set forth a prima facie case of retaliation.

## III. *Americans With Disabilities Act Claim*

■ Boeing next asserts that plaintiff has not made out a prima facie case of disability discrimination. In order to make out a prima facie case, plaintiff must show that (1) he is disabled; (2) he could perform the essential functions of an available job with or without reasonable accommodation; (3) an adverse employment action occurred; and (4) defendant's action raises an inference of unlawful discrimination because of his disability.

Boeing first asserts that plaintiff has not shown that he is disabled. The ADA defines a disability as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment.

*See* 42 U.S.C. § 12102(2). As plaintiff points out, he was severely injured in 1993 while working for Boeing, and he has had surgery on his hands, nose, ears and eyes. But he does not specifically identify the physical or mental impairments that substantially limit one or more major life activities. *See Poindexter v. Atchison, Topeka and Santa Fe Ry. Co.,* 168 F.3d 1228 (10th Cir.1999) (plaintiff must specifically identify the impairment and the major life activity that he claims is substantially limited). At oral argument on the summary judgment motion, plaintiff stated that his physical impairments include hearing and visual problems, and back problems that prevent him from sitting for long periods or walking long distances. These problems are documented in the summary judgment materials. Thus, for purposes of this analysis, the Court will assume that plaintiff has one or more physical impairments.

■ The next question is whether plaintiff has shown that his physical impairments substantially limit one or more of his major life activities. At oral argument, plaintiff stated that he specifically asserts that his physical impairments substantially limit his major life activity of work (or that Boeing believes that they limit his major life activity of work) and, more particularly, his work as a design

engineer. But as the Supreme Court set forth recently in *Sutton v. United Airlines,*

> [w]hen the major life activity under consideration is that of working, the statutory phrase "substantially limits" requires, at a minimum, that plaintiffs allege they are unable to work in a *broad class of jobs.*

—— U.S. ——, ——, 119 S.Ct. 2139, 2150, —— L.Ed.2d —— (emphasis added). The Court finds that the job of aeronautical design engineer is a narrow job category rather than a broad class of jobs.

Even if the job of design engineer is deemed to meet the requirement of a broad class of jobs, plaintiff has not established the remaining elements of a prima facie case of ADA discrimination because he has failed to produce evidence that he suffered an adverse employment action that raises an inference of disability discrimination.

 Plaintiff appears to assert that Boeing mistakenly prohibited him from using CATIA for more than 50 percent of his shift, and that such restriction blocked his transfer from Henley's work group (liaison engineering). The problem with this argument is that plaintiff must concede that his medical restrictions *did* prohibit him from using a personal computer for more than 50 percent of the day. Boeing's interpretation of that restriction as limiting his use of CATIA was not unreasonable. In his brief, plaintiff states that he told his managers that his computer restriction did not include CATIA use. Still, prior to the summer of 1997, he made no effort to have his physician clarify the restriction. Thus, while the original restriction was in effect, plaintiff's managers did not unlawfully discriminate against him by failing to transfer him to jobs which would require him to use CATIA for more than 50 percent of his shift.

Plaintiff also raises an ADA discrimination claim based on the issues of raises and salary increases. He points to his manager's statement that the medical restrictions were "like a chain" on his leg. But, as already noted in the Court's analysis, plaintiff has not established that his performance was equal to others who received higher raises. Thus he cannot establish an adverse employment action. His ADA claims fail.[30]

. **IT IS THEREFORE ORDERED** that *Defendant's Motion For Summary Judgment* (Doc. # 66) filed May 13, 1999, be and hereby is **SUSTAINED.**

---

30. Plaintiff also asserts that Boeing removed medically necessary restrictions, including, specifically, the restriction that allowed him to be up and away from his desk for 15 minutes for each hour to reduce the stress in his back. He does not, however, appear to make an ADA claim on this basis.